UNITED STATES of America, Appellee,

v.

Anthony Anibal TORRES, Appellant.

No. 1098, Docket 82–1318.

United States Court of Appeals,
Second Circuit.

Argued April 21, 1983.

Decided Oct. 4, 1983.

Benjamin Zelermyer, White Plains, N.Y., for appellant.

Marc J. Gottridge, Asst. U.S. Atty., New York City (John S. Martin, Jr., U.S. Atty. for the Southern Dist. of N.Y., Gerard E. Lynch, Asst. U.S. Atty., New York City, of counsel), for appellee.

Before OAKES, PIERCE and PECK,[*] Circuit Judges.

OAKES, Circuit Judge:

Anthony Torres appeals his conviction under 18 U.S.C. § 2113(d) for armed robbery, after a jury trial in the United States District Court for the Southern District of New York, Robert J. Ward, Judge. Torres appeals on two bases: (1) that he was denied effective assistance of counsel; (2) that the Government suppressed exculpatory evidence, contrary to the teachings of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The claims are interrelated, and arise from circumstances that are peculiar, if not bizarre. Because we cannot properly adjudicate Torres's claims without facts which do not appear in the record, we remand for certain findings by the trial judge and retain jurisdiction in the case.

A branch of Citibank, located at 4949 Broadway in New York City, was robbed on August 31, 1981, by an armed individual. Anthony Torres was arrested for the robbery on January 29, 1982, after a federal probation officer identified him in surveillance photographs of the robbery. The critical issue at trial was the identification of Torres as the robber. Three eyewitnesses, Delores Bonapart, a teller, George Zeno, another Citibank employee, and Richard Fontaine, a bank customer, selected Torres's picture as that of the robber upon viewing a photo array. Zeno, the only witness to view a lineup, was unable to identify Torres in the lineup, a result perhaps explainable by the fact that Torres had shaved his head sometime earlier. At trial both Bonapart and Zeno identified Torres as the robber.

Torres testified in his own behalf that he did not rob the bank, but that he was in a nearby park at the time of the robbery, and that investigating City police officers took him to the bank where Bonapart, Zeno, and Fontaine did not identify him as the robber. Torres's claims that he was denied the effective assistance of counsel and that the prosecutor suppressed exculpatory evidence relate to this testimony.

I.

The purported Brady material is an FBI report labeled at trial "defendant's exhibit C for identification," a copy of which is appended hereto. This report describes an incident following the robbery, which was recounted to the FBI by a New York City police officer named Spottke. According to the report, Officer Spottke and a partner searched a nearby park shortly after the robbery and picked up a suspicious individual, identified as "Gregory Sanders, Date of Birth April 14, 1957, Black male, 90 Pitts St., Apartment 3E, New York, New York." Although Sanders did not meet the description of the robber, Officer Spottke brought him to the bank and presented him to the witnesses to the robbery. Several of them thought Sanders "looked familiar," but they did not identify him as the robber, and he was released. On this appeal Torres claims,

---

[*] Of the Sixth Circuit Court of Appeals, sitting by designation.

as he did at trial, that he was the individual described in this report, and that he gave Gregory Sanders's name to Officer Spottke as a reference. The report of the incident was not turned over to defense counsel until quite late in the trial, despite three requests by the defense for *Brady* material.

Torres argues that under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the prosecutor was required to give the FBI report to defense counsel as "exculpatory evidence." It is difficult to evaluate this claim on the record now before us. On its face, the report does not involve Torres at all, but someone named Gregory Sanders. Moreover, it appears from the record that Torres's counsel knew about the incident described in the report, and arguably had ample opportunity to investigate and use such information on his client's behalf. *United States v. LeRoy,* 687 F.2d 610 (2d Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983). Nevertheless, several rather remarkable things about the report itself and its role at trial convince us that the record in this case must be supplemented before we can fairly decide the issues raised on appeal.

First, it is at least a strange coincidence that the Gregory Sanders mentioned in the report gave the same birth date to Officer Spottke as Torres gave to a consulting psychiatrist who examined him prior to the trial, before Torres ever saw the FBI report. Second, as this court ascertained by looking at page 1284 of the Manhattan 1982–83 telephone directory, a Mrs. Irene Saunders lives at 90 Pitt Street in Manhattan, which, according to the FBI report, is the very address given by the person Officer Spottke picked up in the park. Third, according to the report, Sanders "appeared to be familiar" to several bank personnel and "possibly was a customer at the bank," even though he said that he had never been in the bank before, and told Spottke that he had been unemployed for the last several years.

There are, of course, several possible explanations for these puzzling facts in the FBI report. One possibility, obviously, is that a Gregory Sanders (or Saunders) was picked up and taken to the bank. For some reason Sanders looked familiar, but Torres, not he, was the bank robber. In view of the apparently close resemblance between the bank surveillance photos and Torres as he appeared at trial (though not as he appeared in the photographic identification picture), this explanation is perhaps most probable.

Alternatively, it is possible that although Torres robbed the bank, he was the person whom Officer Spottke picked up and later released. Under this scenario, Torres's testimony that he gave Gregory Sanders's name as a reference in respect to his identity was truthful, but for some reason the FBI report was inaccurate on this point; e.g., Officer Spottke misunderstood that Torres was giving Sanders's name as a reference; the Officer erred in recounting the incident to the FBI; or the FBI agent either did not hear, or record, Spottke's description correctly. On this version of events, the man that Spottke took to the bank looked "familiar" because he had robbed the bank shortly before, even though the eyewitnesses could not then identify him.

Torres, by his testimony, suggests a third possibility: that he was not the bank robber, as shown by the fact that he was not identified when he was taken to the bank immediately after the robbery. On this last alternative, he would, we suppose, argue that the subsequent photographic array resulted in his identification because his face was familiar to the witnesses from the incident with Officer Spottke. On this theory, the bank robber was simply a look-alike.

Neither Sanders nor Spottke testified at trial. Thus, we do not know if there is a Gregory Sanders living at 90 Pitt (or Pitts) Street, if he was in fact picked up by Spottke and taken to the bank, or whether his date of birth is actually the same as Torres's, a happenstance which would be

rather extraordinary.[1] This missing information could provide clues as to which version of the events described in the FBI report is correct. Moreover, it has significant bearing on the proper disposition of Torres's claims of a *Brady* violation and denial of effective assistance of counsel. A careful review of events at trial indicates why this is so.

## II.

We do not know when defense counsel, John P. Curley, learned of Torres's claim that he was brought to the bank and not identified by bank personnel. We do know, however, that counsel was aware of an Officer Spottke early in the trial. On his cross-examination of the first eyewitness, Delores Bonapart, Curley asked about the law enforcement people who responded shortly after the robbery. Ms. Bonapart recalled that two police officers came about five minutes after the robbery, although she did not see any police car and did not remember the names of the officers. Before counsel ever saw the FBI report, he asked her directly: "Does the name Police Officer Spottke . . . sound familiar to you?"

In addition, before cross-examining George Zeno, another eyewitness, Curley made a request for any report of, or made by, the two unidentified police officers to whom Ms. Bonapart had referred. As Curley put it, he wished to inquire whether such material was available; if the prosecutor could not provide a definitive answer, he requested that "a thorough search be made before my cross-examination [of the witness Bonapart, who had already been excused] or possible case is concluded." Curley stated "based upon information which is privileged at this point," he believed that a report of, or by, the two officers existed. He suggested that his information related to "that specific officer," who was named in a letter sent to him by the prosecutor.

On cross-examination, Zeno testified that in fact he had left the bank and looked at a suspected "accomplice" who was sitting in the back seat of a squad car. He said that he had never before seen this man, and testified that he "was completely different as far as appearance was concerned" from the man he had seen robbing the bank. He was "positive" that this man was not the bank robber, because the man in the bank was older and had lighter skin that the one in the car. He also testified that Torres was the man he saw robbing the bank and that the man he saw in the squad car was not Torres.

Following Zeno's testimony the following colloquy occurred.

MR. CURLEY: All right. While I'm here, though, your Honor, obviously, I have now developed, through cross-examination, the point that I was hoping to have 3500 material on. It seems to me this witness has unequivocally testified that a suspect, possibly an accomplice, whatever that term means to this lay witness, was brought back to the bank approximately an hour after the incident, for whatever proper investigative purposes were contemplated. I have received nothing on that. . . . And I think it's critical to the case. I think this witness testified that he believes Miss Bonapart did the same thing, which is my understanding upon my investigation. I do have some information that the person was actually out of the car and into the bank, and I don't know where we are at this point. Because I think the record is incomplete, based upon the reports that have been turned over.

MR. GOTTRIDGE: Well, to complete the record, I can represent, after Detective Glatzle and I conferred with the joint bank robbery task force over lunch and also with the 34th Precinct, that what I handed to Mr. Curley and was marked 3510, for identification, is the only piece of 3500 material that relates to any statements at all by any government witness with respect—that were in the possession

---

1. While the odds that any two people have the same day as a date of birth are 364 to 1, the odds that the date would be in the same year are much higher, even if both appear to be young.

of the 34th Precinct. There are no other police reports, period.

Now, it remained open to Mr. Curley, who apparently had all this information about this incident before trial, it remained open to him to have questioned Miss Bonapart about it. And he chose not to do so, hoping, perhaps that there was some 3500 material that he did not know about. Now he's got that material and he's got all of it and I think it ill behooves him to go any further.

Significantly, the report turned over to Curley, labeled "3510 for identification," was a report by Spottke apparently mentioning Ms. Bonapart, and not the FBI report describing the incident involving Gregory Sanders. At this point, the latter was in the government's file, not yet turned over to either the court or counsel.

The document describing the incident with Gregory Sanders was finally produced as a result of Curley's cross-examination of Detective Mary Glatzle. Detective Glatzle testified that a suspect was taken to the bank for several bank employees to view; she recalled reading a report of this incident which referred to Officer Spottke. The court then indicated that the report could come into evidence under Fed.R.Evid. 803(6) or 803(8) as an official report. Despite the prosecutor's emphatic claim only shortly before that "[t]here are no other police reports, period," the Government then produced the report describing the witnesses' view of Sanders.

At this point, the jury was dismissed for the day. Curley then sought Officer Spottke's whereabouts, and the court asked for an offer of proof with regard to his importance, adding that "we're not here to play games, whether Mr. Torres wants to play them or not." Curley then revealed the defense that it was Torres who was brought to the bank. The court insisted that Torres himself could take the stand and testify that he was the person picked up by Officer Spottke; neither Spottke nor his partner was needed. The court further chastised counsel for not asking Ms. Bonapart specifically whether she was asked to identify a suspect in a squad car: "With Mr. Torres sitting right there, you had no excuse for not asking the questions." In response, Curley pointed out that he had not had documents 3510 or C for identification during his cross-examination, and thus that he was on "a fishing expedition" in examining Bonapart and Zeno.

Counsel then called Torres to the stand to make an offer of proof. Torres testified to his version of the events described in document C for identification. He said that he identified himself to Officer Spottke as Anthony Blair (a name by which he said he often went) and gave Sanders's name and address to verify his own identification. He described Spottke as 5′ 11″ and 180–85 pounds. He stated that he was taken to the bank by Spottke and his partner, and that the latter went into the bank and came back with FBI agent Sullivan. He testified further that Sullivan brought Zeno and Bonapart to the car to look at him, and that they said that he, Torres, was not the man who robbed the bank. Finally, Torres said that he then went into the bank with Sullivan and described his conversations with various people, including Zeno.

The Government then began cross-examination by asking Torres what he was doing in the vicinity of 207th Street and Broadway. Curley objected. Without addressing the objection, the judge offered his own comments on Torres's testimony and the value of this defense. He said first that he could not see how Torres could explain away the surveillance photos. He then initiated a discussion which adds a further air of unreality to this case. The judge asked Torres, "when did you tell the story to Mr. Curley?"; Curley objected. The judge then said:

> I don't want to ask him what he told you. I want to know when you knew it. . . . [I]f you knew this sometime back and you didn't do anything about it, I plan to do something about you. Don't you understand? You're an officer of the court.

It is hard to read between the lines of the ensuing colloquy. The judge did not make it clear whether he felt that Curley was

improperly participating in a perjured defense, or whether he had been negligent in not having pursued the matter earlier. The court told Curley that he was

> fast getting ... into a very, very difficult position here. And it goes to the matter of good faith and ethics.
>
> I want you to do everything you can to represent this man. That's fine. But it seems to me, if you knew about this, for example, before Delores Bonapart left this courtroom, you have not fulfilled an obligation you have to the Court, and I would think to your profession and, in the final analysis, to the bar.
>
> Now, if you do not want to answer the question, I am not going to press you, and I'm not going to hold you in contempt for not answering the question. But I think you ought to think about it. Because I'm very concerned about this. I am not here to play games, nor should you be.
>
> You want to take a moment and think about it? I'm perfectly willing to wait. I will not press you beyond what I have. I have a lot of regard for you. I have known you a long time. But I think the Court is entitled to know whether this information came to your attention before Delores Bonapart, the first of the two witnesses we're talking about, left the stand.
>
> Now, I'm not going to press you. You can say nothing; you can respond. You can even confer with your client....

Counsel was certainly now in a difficult position. He had to decide whether to advance the "defense" given him by his client (which, if believed, could cast reasonable doubt upon the testimony of Bonapart and Zeno and might even raise doubts about the guilt of Torres), in face of the court's not wholly veiled, if not wholly clear, threats about ethical violations. Curley stated: "Maybe I or Mr. Torres need separate counsel." Apparently expressing surprise that the trial was even taking place,[2] the judge told Curley that he was now looking at "the manner in which you [Curley] have conducted yourself," and that the lawyer was "in the position where the credibility you have built up with this Court over the last ten years is hanging by a thread."[3] The court continued: "What are we here for? What is the exercise? To satisfy some gratification on the part of Mr. Torres, or to search for the truth?"

There were further exchanges between the judge and counsel, after which Torres asked counsel to "push forth aggressively." Curley then told the court that "the wind has been let out of my sails." The court, trying to "puff a little back in," said it would not "inhibit you from doing what you conscientiously believe," but counsel was not reassured and asked to be relieved. He stated that his "inclination" was to "back down at this point." The court denied the request and told counsel he should "go to the limits that ethics permit you to go." The judge directed the Government and Detective Glatzle to make every effort to have the witnesses available the next day. Unfortunately their efforts to produce Spottke and his partner, Garry Dugan, were unavailing.

When informed of this the next morning the court stated that "at some reasonable point in time" the defense could have subpoenaed the officers, and noted that the Government had not "spirited away" the

---

**2.** [THE COURT:] I was totally surprised at the outset of this trial by a change of position on the part of the defendant and yourself, which I was not apprised of, right up to the time of opening statements, because it was my impression that Mr. Torres had made what he considered a political decision.

**3.** The Government, pressing its advantage, interjected:

> MR. GOTTRIDGE: Your Honor, before we leave that point, I should note that there is evidence on the record that Mr. Curley did know of this before Miss Bonapart left the courthouse, and that was reflected in questions he started probing, as he put it earlier, a fishing expedition on cross-examination of Miss Bonapart.
>
> Now, true he didn't take it to the furtherest [sic] limits, but it's clear that that's where he was going, and it's clear that that was based on a story very similar to that which we just heard from Mr. Torres.

witnesses. The court said, however, that the FBI report, if offered, would be admitted as defendant's exhibit C for identification. Curley then briefly cross-examined Detective Glatzle, attempting unsuccessfully to elicit statements that Torres had gone by the name of Anthony Blair on numerous occasions. The Government rested, and a defense motion for a directed verdict was denied.

The defense then rested, too. After Torres himself objected, counsel reopened the defense case and Torres took the stand. Torres testified as he had during the offer of proof, though in more detail. As anticipated, the Government cross-examined him about his two prior felony convictions. Additionally, the prosecutor effectively cross-examined Torres on his lack of knowledge of the area where he claimed to have been picked up by Officer Spottke, and of the area where he "resided and lived during the weekends" with a girl friend. The witness was excused and the defense rested, inexplicably without offering document C for identification which, by virtue of the birthdate at least, tended to support Torres's story.

### III.

■ On the basis of the record before us, two things seem clear. First, defendant's counsel was in an extremely difficult position. He had to present a defense at his client's strong urging over the deep skepticism of the district judge and the judge's continual warnings about possible ethical violations. Second, contrary to the findings of Judge Ward on hearing a post-trial motion for a new trial, the jury did not receive the case in the light most favorable to the defendant, even if we confine ourselves solely to evidence available to counsel at trial. Most notably, defense counsel never introduced the FBI report, the one piece of evidence that supported Torres's testimony. As a result, the jury never knew that the birthdate given was the same as Torres's. Whether these are the result of a *Brady*

violation or constitute the denial of effective assistance of counsel are the critical issues on this appeal.

In *Brady v. Maryland,* the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196. The FBI report describing the incident with Gregory Sanders was certainly exculpatory insofar as it supported Torres's testimony. Moreover, counsel made several specific requests which should have led the prosecutor to produce the document. These conclusions do not end our analysis, however. As this court observed recently:

> Evidence is not "suppressed" if the defendant either knew, *see, e.g., United States v. Robinson,* 560 F.2d 507, 518 (2d Cir.1977), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978), or should have known, *see, e.g., United States v. Brown,* 582 F.2d 197, 200 (2d Cir.1978), *cert. denied,* 439 U.S. 915, 99 S.Ct. 289, 58 L.Ed.2d 262 (1978), of the essential facts permitting him to take advantage of any exculpatory evidence.

*United States v. LeRoy,* 687 F.2d at 618. *See also United States v. Stewart,* 513 F.2d 957, 960 (2d Cir.1975).

■ It is clear that early in the trial defense counsel was aware of Torres's claim that he was picked up by an Officer Spottke and subsequently not identified by eyewitnesses to the robbery. Thus, the critical question is whether this knowledge constituted "the essential facts permitting [the defendant] to take advantage" of exculpatory evidence. 687 F.2d at 618. The answer to this question is problematic. We take counsel's statement that he was on a "fishing expedition" when he cross-examined Bonapart and Zeno as an admission that he did not quite believe Torres's unique story.[4] Curley's repeated requests for *Bra-*

---

4. With only Torres's word to support the claim he was apprehended and exonerated by the

prosecutor's chief eyewitnesses, counsel's actions make good sense. His client had made

dy material were apparently attempts to verify Torres's story. Having received no reports of the incident described by his client, counsel could only present Torres's seemingly wild tale by either putting him on the stand, felony convictions notwithstanding, or successfully "fishing" for proof in cross-examining Bonapart and Zeno. The former course was very risky. The latter approach is, of course, the one counsel first chose, but it met with very limited success. Thus, the defendant's *Brady* claim comes down to this: had Curley received the FBI report earlier, could he have made materially different use of the information that his client presumably had already given him?

Without the testimony of Spottke, Dugan, and Sanders, we cannot determine whether the FBI report actually tends to exculpate Torres. Thus, we do not know whether Curley could have made different use of the information he received from his client if, prompted by receipt of the report, he had interviewed or subpoenaed Spottke, Dugan, or Sanders. As a result, we cannot fairly address the defendant's *Brady* claim on the record as it now stands.

We face a similar problem in adjudicating Torres's claim that he was denied the effective assistance of counsel. The record below suggests two different bases on which Torres could potentially make such a claim. This is true whether we continue to follow the test established in *United States v. Wight,* 176 F.2d 376, 379 (2d Cir.1949) ("A lack of effective assistance of counsel must be of such a kind as to shock the conscience of the court and make the proceedings a farce and mockery of justice."), *cert. denied,* 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586 (1950), or adopt the standard of every other circuit, as noted in *Barnes v. Jones,* 665 F.2d 427, 431 n. 4 (2d Cir.1981) ("defense counsel [must] act in a reasonably competent and

skillful manner"), *rev'd on other grounds,* —— U.S. ——, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). *See United States v. Helgesen,* 669 F.2d 69, 71 (2d Cir.1982), *cert. denied,* 456 U.S. 929, 102 S.Ct. 1978, 72 L.Ed.2d 445 (1982); *United States v. Aulet,* 618 F.2d 182, 187 (2d Cir.1980); *United States v. Alessi,* 638 F.2d 466, 477 (2d Cir.1980); *Indiviglio v. United States,* 612 F.2d 624, 629 n. 8 (2d Cir.1979), *cert. denied,* 445 U.S. 933, 100 S.Ct. 1326, 63 L.Ed.2d 768 (1980); *Rickenbacker v. Warden,* 550 F.2d 62, 65–66 (2d Cir.1976), *cert. denied,* 434 U.S. 826, 98 S.Ct. 103, 54 L.Ed.2d 85 (1977).

First, an argument can be made that Curley did not properly present the defense with which Torres had equipped him. For example, he did not secure Spottke's testimony and did not directly question Bonapart about his client's story. One plausible interpretation of the court's comments after Bonapart was dismissed is that the judge was angry at counsel for precisely this reason. Whether Curley's failures constituted ineffective assistance of counsel depends, however, on whether the testimony of Spottke or others would have supported Torres's defense. If, for example, Spottke would have merely corroborated Zeno's testimony that the man brought to the bank was not Torres, Curley's failure to subpoena him did not prejudice the defendant. Alternatively, if the officer would have supported Torres, or even simply been less positive than Zeno about whether Torres was the suspect presented to the witnesses, then counsel's failure was serious indeed. Moreover, the prejudice to the defendant would be all the more egregious given that the prosecutor withheld the report which might have led Curley to believe his client's story and thus to act effectively on his behalf.

Second, there is no question that the ethical doubts raised by the trial court had the

more than one outlandish, or at least unprovable, claim; e.g., that the police seized a score of file boxes and ten thousand index cards from his apartment, even though none of these items were reflected in the police inventory. A reasonable attorney may well have thought that Torres fabricated both incidents. Accordingly, without the FBI report indicating that someone

who gave Torres's birthdate was picked up, and having had little success in verifying Torres's story through cross-examination, counsel quite reasonably opposed calling Torres to testify. The resulting tension between counsel and the defendant, we suggest, was largely responsible for the problems between the court and counsel.

potential to interfere with counsel's representation of the defendant.[5] The record clearly indicates that Curley felt threatened by the judge's remarks. The Government's extravagant denials of the existence of the report sought could only have heightened Curley's fears that his client's claims were untrue. When challenged by the judge for his unsuccessful "fishing expeditions" with Bonapart and Zeno, counsel's belated receipt of the FBI report provided only small comfort. Thus, whether the court's ire was directed at counsel because the judge suspected perjury, or because he believed that counsel had performed badly in presenting Torres's story, it potentially undermined Torres's right to effective assistance of counsel. Before we can evaluate whether the court's ethical questions were justified, we need to know more.

Unlike the trial judge, we are not 100% convinced of Torres's guilt based on the bank surveillance photographs. At least three of the persons in the photographic array arguably resemble the person in the surveillance pictures as closely as does Torres. Thus, we remand for findings on Officers Spottke's and Dugan's version, under oath and with cross-examination, of the events described in defendant's exhibit C for identification. If there is a Gregory Sanders who can be located, his testimony would also be helpful. We leave it open to, but do not require, the trial court to order a new trial, if the court believes that such would be in the interest of justice. *See* Fed.R.Civ.P. 33.

Remanded for supplementation of the record, in accordance with this opinion.

APPENDIX

[A.53]

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription  September 4, 198

Subsequent to the robbery of the Citibank, 4949 Broadway, New York, New York, which occurred on August 31, 1981, Special Agent (SA) TIMOTHY SULLIVAN, III, of the Federal Bureau of Investigation (FBI) interviewed Police Officer SPOTTKE, of the 34th Precinct, Badge Number 18153. SPOTTKE advised that he responded to the robbery several minutes after it occurred. He stated that he obtained a direction of escape from witnesses at the bank indicating the individual fled east on 207th Street. He stated that he then approached the park located at the corner of Ishiam and Seamen Avenues, New York, New York, where he saw two young males who advised him that they saw an individua carrying a green knapsack fitting the description of the bank robber in the park. SPOTTKE advised that he did not obtain these individual's names because he felt he was in hot pursuit. SPOTTKE advised that he and his partner then began a search of the park. He stated they found one suspicious individual in the park, however, he did not fit the description of the bank robber. He advised this individual's name is GREGORY SANDERS, Date of Birth April 14, 1957, Black male, 90 Pitts Street, Apartment 3E, New York, New York. He further advised that SANDERS stated that he had never been in the bank before. He stated that he brought SANDERS back to the bank at which time several bank personnel advised that SANDERS appeared to be familiar and possibly was a customer at the bank. He stated that SANDERS informed him that

---

5. The situation was compounded further by the court's misapprehension of a rule of evidence. The court thought that if Spottke and Dugan were called as defense witnesses, the defense would be bound by their answers. The court inquired, mistakenly: "What can they properly testify to as defense witnesses? Clearly the government is not going to call them.... Are you not bound by their answers at that point." The old rule against impeaching one's own witness has been abandoned by the federal rules: "The credibility of a witness may be attacked by any party, including the party calling him." Fed.R.Evid. 607. This error may have discouraged counsel from aggressively pursuing his attempt to call the officers as witnesses.

558

he had been unemployed for the last several years. He stated that SANDERS was located in the park in the vicinity of where the bank robber disappeared. He stated that a search of the park failed to reveal any clothing or knapsack.

Investigation on ___ August 31, 1981, New York, New York _____ File # __NY 91-22527____

by__SA TIMOTHY SULLIVAN, III:wyh_____Date dictated__August 31, 1981____

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.