UNITED STATES of America, Appellee,

v.

Nicholas SPERLING, Defendant-Appellant.

No. 213, Docket 83–1164.

United States Court of Appeals, Second Circuit.

Argued Oct. 20, 1983.

Decided Jan. 20, 1984.

Roger Bennet Adler, New York City (Robert Blossner, Deborah A. Schwartz, New York City, of counsel), for defendant-appellant.

Rhea Neugarten, Asst. U.S. Atty., S.D. N.Y., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Benito Romano, John M. McEnany, Peter Romatowski, Asst. U.S. Attys., S.D.N.Y., New York City, of counsel), for appellee.

Before FRIENDLY, VAN GRAAFEILAND and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

Nicholas Sperling appeals his conviction for distribution of and possession with intent to distribute heroin under 21 U.S.C. § 841(a)(1) (1982) and for conspiracy to commit the substantive offense under 21 U.S.C. § 846 (1982). We affirm.

I

In 1977, Leroy "Nicky" Barnes was convicted of various narcotics offenses and of conducting a continuing criminal enterprise. After an unsuccessful appeal and petition for certiorari, Barnes began serving a life sentence without the possibility of parole. In 1982, he began providing information to the government in exchange for a promise that the Pardon Bureau in Washington, D.C. and anyone else he wanted would learn of his cooperation, and in the hope that his actions would eventually earn him a Presidential pardon.

Barnes was the government's most important witness in the trial that is the subject of this appeal. In January 1982, he was transferred to the Metropolitan Correctional Center (MCC) in New York City. Appellant Sperling's father, Herbert Sperling, was serving a life sentence for various narcotics offenses and was transferred to the MCC at about the same time. Barnes testified that he and Herbert Sperling agreed that Beverly Ash, a former girlfriend of Barnes, would meet with Nicholas Sperling to carry out a narcotics transaction at the Stage Delicatessen in midtown Man-

hattan. According to Barnes, Ash and Nicholas Sperling were to carry *Life* magazines as a recognition signal. Immediately after this discussion with Herbert Sperling, Barnes called the Drug Enforcement Administration (DEA) and reported on the proposed heroin deal.

The jury heard testimony about the following events. On February 11, 1982, DEA Agent Stanley Morrissey observed Ash at the Stage Delicatessen carrying a *Life* magazine. Nicholas Sperling entered the delicatessen with a folded magazine, left after a few minutes, returned without the magazine and seated himself across from Ash. Sperling placed a white piece of paper in front of Ash and left a few minutes later.

About a week after that meeting, DEA Agent Robert Baker, posing as a heroin buyer, was introduced to Ash. Ash discussed a possible sale with Baker and gave him a list of heroin prices. Two weeks later, she gave him another price list and a sample of heroin. According to Barnes, Herbert Sperling told him later that Nicholas Sperling had passed a sample of heroin to Ash.

Early on April 15, 1982, Ash called Baker to tell him she was going to meet her "source" at noon that day. From 11:35 a.m. when Ash left her apartment until 2:00 p.m. when she returned, she remained alone except for a 12:15 p.m. meeting with Nicholas Sperling at the Stage Delicatessen. No heroin was passed during that meeting and Sperling left within ten minutes of seeing Ash. At about 2:00 p.m., pursuant to their earlier arrangement, Baker called Ash and learned that Ash's "source" had agreed to

sell Baker four ounces of heroin. Ash discussed the proposed sale with Baker several times before and after the April 15 meeting and referred to her source as a "young guy" and as "Nick" or "Nicky." The proposed sale never materialized, however. Ash was indicted along with Sperling but was murdered before trial.

After Sperling's trial and conviction, the government turned over to the defense a transcript of a pretrial conversation between Barnes and Chief Assistant United States Attorney William Tendy in which Barnes indicated that his primary motive for being an informant was to get back at his "former friends."[1] Sperling then moved before Judge Knapp for a new trial under Fed.R.Crim.P. 33. The government conceded that it should have produced the tape, but claimed that the tape was not deliberately suppressed and was cumulative in any event. Judge Knapp denied the motion. Sperling appeals from the judgment of conviction and from the denial of his post-trial motion.

## II

Sperling contends that he is entitled to a new trial because of the government's failure to disclose significant Jencks Act material in a "closely contested case." In the alternative, he asks for a hearing to determine whether the government's failure to produce the tape until after trial was deliberate or merely negligent. Sperling also argues that state of mind declarations of others were improperly admitted to show his state of mind and that testimony of

---

1. The pertinent portions of this conversation are as follows:

   TENDY: O.K. Now, go ahead. Tell me what it is you have in mind.

   BARNES: Well ... er ... [sighs] you mean specifically, right?

   TENDY: Well, no, just generally—the reason why you want to get in touch with me.

   BARNES: Well, in general, there, there, there are a, a few friends of mine, former friends of mine, that ... er ... that were just ....

   TENDY: I can't hear you very well.

   BARNES: Er ... there were a couple of friends of mine that were supposed to be doing things for me, you know ....

   TENDY: Yeah?

   BARNES: And er, and er, well, they're doing things against me really ....

   TENDY: Um hum.

   BARNES: And, and, and I have no way to reach out to get to 'em and I want to get back at 'em, really.

   TENDY: Um hum.

   BARNES: That's my primary reason.

   TENDY: Yeah?

   BARNES: And, er ... I ... I wanted to know what I could possibly do, you know, what, er, you know, what it is that you might want. App. at 218–19 (transcript dated July 2, 1982).

drug transactions occurring prior to the alleged conspiracy was improperly admitted as background to the conspiracy. He further claims that he was unfairly prejudiced by being cross-examined about his lifestyle, spending habits, false credit card applications and post-arrest statements. Additionally, he complains about the court's exclusion of evidence of his co-conspirator's other drug dealings. Finally, he maintains that there was insufficient evidence to support the jury's guilty verdict on the distribution count.

We conclude that even if the government withheld the tape deliberately, which it denies, there is no reasonable likelihood that the timely production of the tape would have affected the verdict. We find no merit in Sperling's other claims.

The seminal case on the issue of government withheld evidence is *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), in which the Supreme Court stated that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." This standard was clarified in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), in which the Supreme Court set forth three distinct categories of cases to which *Brady* applies: (1) where the undisclosed evidence shows that the government's case included perjured testimony about which the government knew or should have known; (2) where the defendant made a specific request for *particular* undisclosed information; or (3) where the defendant made only a general request or no request at all. If the evidence falls into either of the first two categories, a new trial must be granted if there is any reasonable likelihood that the undisclosed evidence could have changed the verdict. If the evidence is within the third category, a new trial is required only if the undisclosed evidence creates a reasonable doubt where there was none before. *See Ostrer v. United States,* 577 F.2d 782, 786 (2d Cir.1978),

*cert. denied,* 439 U.S. 1115, 99 S.Ct. 1018, 59 L.Ed.2d 73 (1979).

Judge Knapp assumed that Sperling did make a specific request for tapes and that the failure to produce the Barnes-Tendy tape fell into the second category, calling for application of the stricter standard. He nonetheless held that the tape was only a cumulative statement of what was already before the jury, and that there was no reasonable ground for believing the verdict might have been different if Sperling had obtained the tape before trial. We agree.

Barnes gave ample testimony tending to show that revenge was his motive for cooperating with the government. First, Barnes testified on cross-examination that he gave information against his attorneys "because they double-crossed me like everybody else did." App. at 100. Second, Barnes also testified on cross-examination that he gave information leading to the arrest of his former girlfriends, Thelma Grant and Beverly Ash, partly because they had sexual relations with some of his friends who were fellow members of his council of prominent heroin dealers. App. at 115–17. Third, on redirect examination, Barnes again indicated his displeasure with "the Detroit lawyers [who] had swindled me out of big pieces of money," and with Grant and Ash, who Barnes said did "the only thing I asked them not to do." App. at 120–21.

Sperling, however, focuses on a later portion of the redirect examination. He claims that Barnes' more introspective stated reasons for cooperation, such as the fact that he once defined his life in terms of narcotics and now found his life meaningless, were the *only* reasons he gave at trial for cooperating. Thus, Sperling concludes, the Barnes-Tendy tape gave reasons for cooperation that were different from those elicited at trial. This claim is contradicted by the testimony. Moreover, the government's question that led to Barnes' introspective monologue was whether there were any reasons Barnes might have had for cooperating *other than* his relations with Grant and Ash. Also, the redirect testimony that

tended to show a revenge motive, dealing with Barnes' Detroit lawyers and the relations between his fellow council members and his girlfriends, immediately preceded Barnes' more introspective musings. In sum, the tape indicating that Barnes' reason for cooperating with the government was to get back at unnamed former friends adds nothing of importance to Sperling's case.

There was ample record testimony that would have tended to impeach Barnes' testimony. The defense sought to destroy Barnes' credibility on cross-examination by eliciting a litany of Barnes' past misdeeds. The government began its direct examination by asking Barnes about his prior convictions and discussed his heroin dealings at great length. Even Judge Knapp pointed out during voir dire that Barnes was a person of questionable reputation, and Barnes himself testified about his revenge motive for cooperation. A few words on a tape indicating that Barnes had turned informant to get back at former friends, in light of this mountain of impeaching evidence, could not have made a difference at trial.

Finally, we find no merit in Sperling's contention that failure to produce the tape should result in a retrial or a hearing because the case was close. The *Agurs* standard used by Judge Knapp gave any possible benefit of the doubt to Sperling. Thus, we hold that nothing on the tape could have been used by skilled counsel to induce "a reasonable doubt in the minds of enough jurors to avoid a conviction." *United States v. Miller,* 411 F.2d 825, 832 (2d Cir. 1969). Even if the government's misconduct was wanton and deliberate (which we do not suggest here), the lack of this evidence could not reasonably have affected the verdict.

Sperling's counsel nonetheless suggested at oral argument that this Court should go beyond the *Agurs* standards and exercise its supervisory power to determine whether the government actually engaged in misconduct. He seeks punishment for misconduct or even for repeated negligence if either is found. We do not condone repeated acts of negligence or deliberate suppression of evidence by the government, but we do not believe that it is appropriate on this record to reverse or to remand for further proceedings. *See Brady,* 373 U.S. at 87, 83 S.Ct. at 1196; *Agurs,* 427 U.S. at 110, 96 S.Ct. at 2400; *United States v. Sperling,* 506 F.2d 1323, 1333 (2d Cir.1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975). In a proper case the government's conduct may provide its own punishment, such as when it fails to produce potentially material evidence which might have led to a different result. *Cf. United States v. Miller,* 411 F.2d 825 (2d Cir.1969) (new trial granted for prosecution's failure to disclose that defendant was questioned by prosecutor while under pretrial hypnosis). In this case, however, the issue of culpability has no bearing on the fairness of Sperling's trial.[2]

### III

Sperling next argues that his participation in a conspiracy was not proved by a fair preponderance of the evidence independent of hearsay utterances. *See United States v. Geaney,* 417 F.2d 1116 (2d Cir. 1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). He contends that conversations between his father and Barnes, and between Baker and Beverly Ash, are inadmissible to show his state of mind. Sperling contends that the *Hillmon* doctrine which creates an exception to the hearsay rule for testimony as to a declarant's state of mind, Fed.R.Evid. 803(3); *see Mutual Life Insurance Co. v. Hillmon,* 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892), cannot be extended to admit testimony to show the state of mind of a *nondeclarant.*

2. *United States v. Torres,* 719 F.2d 549 (2d Cir.1983), relied on by appellant at oral argument, is inapposite. In *Torres,* the belatedly produced evidence, an FBI report, was ambiguous and subject to several possible explanations, depending on facts that had not been produced at trial. Remand was therefore appropriate to determine how to interpret the report. Here, however, there is no ambiguity in the tape and Judge Knapp could correctly conclude that it was cumulative impeaching evidence.

Specifically, Sperling argues that Beverly Ash's statements to Agent Baker regarding her April 15 meeting with Sperling at the Stage Delicatessen, and Barnes' testimony that Herbert Sperling said he would send his son to the Stage Delicatessen for a heroin transaction, are hearsay statements not admissible under *Hillmon.*

However, the government is not attempting to use *Hillmon* to show the state of mind of a nondeclarant. It instead relies on *United States v. Cicale,* 691 F.2d 95 (2d Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1771, 76 L.Ed.2d 344 (1983), for the position that a declarant's *Hillmon* declarations regarding his own state of mind are admissible against a nondeclarant when they are linked with independent evidence that corroborates the declarations.

We need not join the debate regarding whether or not Hillmon declarations are admissible to prove the state of mind of a third party. *See, e.g., Cicale,* 691 F.2d at 109 (Ward, J., dissenting). We follow the law of this Circuit as set forth in *Cicale.* In that case, one Messina repeatedly told a DEA agent that he was going to meet with his "source." Soon after each declaration, Messina was seen with Cicale or arriving at Cicale's residence. We held that where Cicale's participation in meetings with Messina was proven by competent nonhearsay evidence independent of the *Hillmon* declarations, Messina's *Hillmon* declarations were admissible to show that the meetings were the drug transactions of which he spoke. In other words, Messina's declarations could be admitted to show his state of mind, *i.e.,* his intent to meet with an unknown heroin source. When independent evidence showed that Messina met with Cicale and that the meeting could be linked to Messina's declarations, Cicale's participation in the heroin deal with Messina was proved.

The instant case is controlled by *Cicale.* Ash told DEA Agent Baker of her intent to engage in an illicit transaction at noon. She met with no one between 11:30 a.m. and 2:00 p.m. except Nicholas Sperling. This eyewitness testimony of the DEA agents who watched Ash links Sperling to the proposed drug transaction that Ash described to Baker in her *Hillmon* declaration.

So also does Nicholas Sperling's own testimony about the actions described in the Barnes-Herbert Sperling conversation, *i.e.,* meeting Ash at the Stage Delicatessen with a magazine in hand.

## IV

▇ Sperling also contends that the trial court erred in denying a motion to strike Barnes' testimony regarding 1980 conversations between Barnes and Herbert Sperling at the Federal Penitentiary in Marion, Illinois. The trial court ruled that the conversations were inadmissible as part of the 1982 conspiracy, but that they could be admitted as background to that conspiracy to show a prior successful course of dealing. The court also held, however, that two short references to Nicholas Sperling in the 1980 conversations were inadmissible under any circumstances, but denied Sperling's motion for a mistrial on the ground that the jury had probably forgotten those references and that any error caused by admitting them was harmless.

Sperling seems to contend only that the admission of the Barnes-Herbert Sperling conversations as background was reversible error. We reject this contention. In *United States v. Moten,* 564 F.2d 620, 628 (2d Cir.), *cert. denied,* 434 U.S. 959, 98 S.Ct. 489, 54 L.Ed.2d 318 (1977), we held that "proof of prior drug dealing by individual defendants with [a government informant] . . . was clearly admissible to show the basis for the existence of the conspiracy charged and the mutual trust which existed between [the informant] and his customers." Even if Sperling's claim is that the two brief references to him early in the lengthy Barnes testimony prejudiced him with the jury, we agree that the admission of those two passages, at most, was harmless error.

▇ We also reject Sperling's claim that the government improperly cross-examined him regarding his lifestyle, spending habits, false credit card applications and post-arrest statements. The government was entitled to use otherwise unexplained or unexplainable sources of income to prove illegal dealings and to cross-examine Sperling regarding his lavish expenditures. *E.g., United States v. Barnes,* 604 F.2d 121, 147 (2d

Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). It was also proper for the government to cross-examine Sperling regarding his false credit card applications to show a general lack of credibility. This is acceptable cross-examination under Fed.R.Evid. 608(b)(1). Sperling's post-arrest statements were admissible in the absence of an allegation that his *Miranda* rights were violated. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), relied on by appellant, is inapposite here, as that case relates only to post-arrest *silence.* Furthermore, there is not even a hint that the evidence was more prejudicial than probative. The district court did not abuse its broad discretion on this evidentiary ruling. *E.g., United States v. Aulet,* 618 F.2d 182, 191 (2d Cir.1980).

Appellant's last two claims are also meritless. Evidence of Ash's subsequent heroin dealings with DEA Agent Baker was irrelevant and thus properly excluded, and there was ample evidence to support a guilty verdict on Count II (distribution).

Affirmed.