## CHESTER ORSINI *v.* JOHN R. MANSON, COMMISSIONER OF CORRECTION
### (3802)

HULL, BORDEN and DALY, Js.

Argued June 11—decision released September 17, 1985

*Mark Rademacher,* with whom, on the brief, was *John R. Williams,* for the appellant (petitioner).

*Carl Schuman,* assistant state's attorney, with whom, on the brief, were *Kevin Kane* and *Paul E. Murray,* assistant state's attorneys, for the appellee (respondent).

BORDEN, J. The petitioner appeals[1] from the judgment of the trial court dismissing his petition for a writ of habeas corpus challenging the validity of his convictions of larceny in the second degree, conspiracy to commit larceny in the second degree, and being a persistent

---

[1] The trial court certified that questions are involved in this decision which ought to be reviewed by this court. General Statutes § 52-470 (b).

offender. This case is the aftermath of *State* v. *Orsini,* 187 Conn. 264, 445 A.2d 887, cert. denied, 459 U.S. 861, 103 S. Ct. 136, 74 L. Ed. 2d 116 (1982), in which the Supreme Court sustained those convictions.

The petitioner claims on appeal that he was denied due process of law because of the admitted failure of the state to disclose, at his original trial, the fact that two of the state's witnesses were under arrest for pending unrelated state charges when they testified in that trial. The trial court in this case dismissed the petitioner's petition because he had not established a miscarriage of justice. We find no error.

The petitioner's convictions arose from a series of three burglaries and thefts committed by Morris Ashcroft and some companions. The petitioner purchased weapons from Ashcroft which were the fruits of the burglaries. *State* v. *Orsini,* supra, 266–67.

After our Supreme Court rejected his direct appeal and the United States Supreme Court denied certiorari, the petitioner filed this action. His revised petition alleged essentially that the state withheld exculpatory information consisting of the arrest of and pending charges against three of the state's witnesses in his original trial: Ashcroft, Walter Hazuka and James Hirst. In this appeal, he has failed to brief any claims regarding Hirst, which claims are considered abandoned. *State* v. *Gradzik,* 193 Conn. 35, 44 n.11, 475 A.2d 269 (1984). We, therefore, confine our discussion to the claims regarding Ashcroft and Hazuka.

At the petitioner's criminal trial, held in the Superior Court for the Middlesex judicial district, he made an oral, pretrial request of the state's attorney for the record of pending arrests of and criminal charges against any of the state's potential witnesses, he filed a written motion requesting "any exculpatory information or materials," and he subpoenaed any state police rec-

ords regarding Ashcroft. The state's attorney, in accordance with his open file policy, permitted the petitioner's attorney to examine his file. Also, having received assurances from William Doyle, his inspector, that no state's witnesses had other charges pending against them, he informed the petitioner's attorney of that fact. The petitioner knew that Ashcroft had been arrested and was facing criminal charges arising out of the burglaries and thefts which were the basis of the charges against the petitioner. The state's attorney also replied in writing to the petitioner's motion that, with one exception not relevant here, he had no exculpatory material. The state police responded to the petitioner's subpoena that there were no records regarding Ashcroft.

In fact, both Ashcroft and Hazuka were facing other, unrelated state charges in geographical area number nine of the Court of Common Pleas, located in Middletown. Ashcroft was facing state police charges of attempted first degree larceny by extortion. Hazuka was facing charges of second degree reckless endangerment, illegal discharge of firearms, carrying a dangerous weapon and possession of marihuana.

The state concedes, as it must, that all these charges should have been disclosed to the petitioner, because they would have furnished grist for the mill of cross examination based on "possible bias or interest resulting from inducements made by the [state]." *United States* v. *Bagley,* 473 U.S. 667, 678, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). "Information that a witness has been arrested, is being prosecuted, or has confessed to a crime, tends to show that the state has power over a witness which may induce him to give testimony which will win favor with the state. . . ." *State* v. *Grasso,* 172 Conn. 298, 302, 374 A.2d 239 (1977).[2]

---

[2] The state also concedes that the nondisclosure of this evidence constitutes "suppression," within the meaning of that term under *Brady* v. *Mary-*

This does not end our inquiry, however. "To mount a successful collateral attack on his conviction a prisoner must demonstrate a miscarriage of justice or other prejudice and not merely an error which might entitle him to relief on appeal." *D'Amico* v. *Manson,* 193 Conn. 144, 156–57, 476 A.2d 543 (1984). The fact that the nondisclosed evidence was exculpatory, in the sense that it could have been used to impeach Ashcroft and Hazuka; see *United States* v. *Bagley,* supra; is not dispositive. It must also be "material" in the constitutional sense. Id., 678–81.

We find fresh and authoritative guidance in the very recent decision of the United States Supreme Court in *United States* v. *Bagley,* supra. Where the suppression involves a "failure to assist the defense by disclosing information that might have been helpful in conducting the cross-examination . . . such suppression of evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial. Consistent with 'our overriding concern with the justice of the finding of guilt,' *United States* v. *Agurs,* [427 U.S. 97, 112, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976)], a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *United States* v. *Bagley,* supra, 678.

A majority of the *Bagley* court agreed on a further refinement of the standard of materiality. Where there has been no request for exculpatory evidence, or, as in this case, where there has been either a general or

*land,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and its progeny, "irrespective of the good faith or bad faith of the prosecution." Id., 87. We note in this connection that the trial court in this case made a specific finding that "there was no scheme or plan in the state's attorney's office to withhold any information from the petitioner or his attorney at the time of the original trial."

a specific request, "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id., 682. Where the suppressed evidence is cumulative, however, of what was already placed before the jury by other evidence, it is not material in the constitutional sense. *United States* v. *Sperling,* 726 F.2d 69, 71–73 (2d Cir.), cert. denied, 467 U.S. 1243, 104 S. Ct. 3516, 82 L. Ed. 2d 824 (1984); see *State* v. *Baker,* 195 Conn. 598, 609–610, 489 A.2d 1041 (1985).

With these principles in mind we analyze the materiality of the suppressed evidence.

## I

### MORRIS ASHCROFT

The state concedes that Ashcroft was its key witness at the original trial. After the first burglary, Ashcroft went to a gas station owned by Thomas Cestaro, who told Ashcroft that the petitioner would be a potential customer for the guns. Ashcroft testified essentially that after committing each burglary he met with the petitioner and sold him the stolen guns, telling the petitioner in each instance that they were stolen.

Ashcroft also testified under direct and redirect examination that he was under arrest for larceny in the first degree and burglary in the third degree in connection with these crimes, and the jury was informed that he had not yet pleaded to those charges. His redirect examination also disclosed to the jury that he lived in Ontario, Canada, that he had met voluntarily with the Connecticut state police in Ontario and that he had returned voluntarily to Connecticut.

His cross examination, which consumed eighty-one pages of transcript, further emphasized the pending charges against him. It also elicited that he had not been charged with conspiracy, a charge for which the petitioner was being tried, and that he had been released on a nonsurety bond.

All of this evidence provided a substantial basis for the jury to consider, and for the petitioner to argue, that Ashcroft had been given inducements by the state to color, or even concoct his testimony against the petitioner. As our Supreme Court has already noted, "[t]he [petitioner] was not inhibited . . . from exploring the motivations of the witnesses for testifying in relation to the disposition of any pending criminal charges, inquiries which were in fact vigorously pursued at trial without restriction." *State* v. *Orsini,* supra, 269. "The present case . . . does not involve any direct restriction on the scope of cross-examination. The defense was free to cross-examine the [witness] on any relevant subject, including possible bias or interest resulting from inducements made by the [state]." *United States* v. *Bagley,* supra, 678. It is clear that the jury believed Ashcroft, even though they were faced with the facts that he was being given quite deferential treatment by the state despite his central, active role in the very criminal scheme at issue, and that he was being equally cooperative with his governmental benefactors. We cannot say, therefore, that had they also been informed that he was facing other, unrelated state criminal charges, it is reasonably probable that their verdict would have been different. The evidence in question was cumulative. We fail to find " 'a probability sufficient to undermine confidence in the outcome.' " Id., 682.

The petitioner spent part of his brief and much of his oral argument in this court arguing a claim which is not properly before this court. At the very end of

his case in chief at the hearing on his petition, the petitioner introduced, through Dennis Fennessy, a probation officer, records of the department of adult probation concerning Ashcroft, who, prior to his arrest for the burglaries and larcenies at issue here, was being supervised on accelerated rehabilitation arising out of other, pre-existing charges. Among these records was the following handwritten notation of the probation officer: "[Probation officer] has telephone conversation with [Connecticut state police] detective Spencer—they have a sup. crt. bench warrant for [Ashcroft] charging Burg. 3d° and Larc. 1st° [a reference to the burglaries and larcenies involved here]—They will not extradite—Det. Spencer and Bill Doyle have talked to [Ashcroft]—if he will testify against a 'fence' and return voluntarily they may recommend a suspended sentence." The entire testimony of Fennessy regarding this notation is quoted in the footnote.[3] The same records indicate that, in fact, Ashcroft did receive a suspended sentence.

---

[3] "Q [By Mr. Williams, the petitioner's attorney]: As a matter of fact this report indicates that on September—I'm sorry, on December 9th, 1975, that the Department of Adult Probation was advised by Detective Spencer (phonetic spelling) of the Connecticut State Police that the superior court bench warrant had issued for Mr. Ashcroft, but that the State Police would not extradite him. That Detective Spencer and Bill Doyle have entered into an agreement under which if Ashcroft quote, will testify against a fence and return voluntarily, they may recommmend a suspended sentence. Is that right?

"Mr. Schuman: Well your Honor I object to Mr. William's continual leading questions. In addition the report speaks for itself.

"Mr. Williams: The report does speak for itself but I want to clarify on the record the point that I think is relevant too your Honor, in connection with this particular exhibit.

"The Court: You may answer. Obviously the exhibit speaks for itself.

"A: That is correct that there is a notation of discussion about the charges, fact that there was not extradition in that the hope was that this person would testify against a quote, return fence unquote, and that if he did the people involved would attempt to recommend suspended sentence.

"Q: Okay referring sir to that portion of this exhibit which is the—which is an interview form dated September 17, 1974 on the reverse side, there

Approximately two months later, after the hearing had been completed and on the date set by the court for filing of simultaneous briefs, the petitioner filed a motion to amend his revised petition in order to add an additional claim that "[t]he State further withheld from him the exculpatory information that the State had promised Ashcroft a suspended sentence on his pending criminal charges if he would testify against the petitioner." The state objected on essentially three bases: (1) unreasonable delay by the petitioner in moving to revise his petition; (2) the petitioner could have moved to revise during his pretrial preparation or during the trial, rather than waiting and requiring the state

is the following language written in. Try to extort $5,000 from a guy, told him someone was going to kill him, if paid $25,000 would prevent it, try to scare a person because he had fired a few of my friends. Is that the incident for which Mr. Ashcroft was placed on the period of Accelerated Rehabilitation originally?

"A: I would believe so. That would be—a probation officer must have asked the individual, why are you here? What did you do and what was the response.

"Q: All right.

"Mr. Williams: I have nothing further of this witness, your honor.

Cross examination by Mr. Schuman

"Q: Mr. Fennessy can you show me where on Exhibit 22 there is a reference to a possibility that Mr. Ashcroft might get a suspended sentence?

"A: Was in the field notes made by the probation officer, dated December 9th, 1975, indicate probation officer had telephone conversation with Connecticut State Police Detective Spencer and discussed a bench warrant for Mr. Ashcroft charging burglary 3rd, larceny first and extradite, and that the Detective Spencer and Bill Doyle have talked to the probationer and if he will testify against quote, fence, unquote voluntarily, they may recommend a suspended sentence.

"Q: Okay now Mr. Fennessy did you attend the trial in this case?

"A: No.

"Q: So you don't know whether or not Mr. Orsini's attorney asked Mr. Ashcroft about promises of leniency or about offers of suspended sentence?

"A: No.

"Q: Okay.

"Mr. Schuman: Nothing further, your Honor.

"Mr. Williams: I have nothing further.

"The Court: Thank you, sir.

"Mr. Williams: We rest, your Honor."

to write a simultaneous brief in response to a petition which the petitioner intended to amend; and (3) prejudice to the state, grounded on its assertion that, had it known that an undisclosed promise of leniency was being claimed, it would have called witnesses, namely the state's attorney and Doyle, regarding whether such promises were made.

The trial court, in its memorandum of decision dated November 26, 1984, noted both the petitioner's motion to revise and the state's objection, but it neither granted the motion nor made any finding of fact regarding the petitioner's new claim. The petitioner took no further steps to secure a ruling on this motion or to require the trial court to make a finding based on the evidence regarding this claim. See *Gennarini Construction Co.* v. *Messina Painting & Decorating Co.*, 5 Conn. App. 61, 66, 496 A.2d 539 (1985).

Despite this history, and despite the petitioner's disregard for his obligation as the appellant to present an adequate appellate record upon which his claim can be reviewed; *State* v. *Cunningham*, 3 Conn. App. 353, 358, 488 A.2d 834 (1985); he disingenuously attempts in his brief to elevate this evidence to a full blown finding that "Bill Doyle of the State's Attorney's office had entered into an agreement under which Ashcroft was promised a suspended sentence if he would testify against the petitioner," and that "the chief prosecution witness actually had made a deal in which he would receive a suspended sentence in exchange for his testimony against [the] petitioner . . . ." This claim is simply not before us on this appeal.

First, we note that the trial court never acted on the petitioner's motion to make this claim part of his case, and he made no attempt to require it to do so. The case was neither pleaded nor tried on a claim of promises of undisclosed leniency. The notation in the record on

which the petitioner relies is not compelling that there was a promise to or agreement with Ashcroft for a suspended sentence. It is not clear, for example, that the conversation with Ashcroft included Spencer's and Doyle's purported intention to recommend a suspended sentence. See footnote 3 and accompanying text. The existence of such a promise or agreement would have been a factual determination for the trial court, which we cannot make from this record. Certainly, had there been such a claim, the state was entitled to adequate notice so that the critical witnesses could be brought forward. The nature and timing of the petitioner's claim in this regard virtually precluded such a response by the state.

Second, the lateness of such a claim is particularly significant here. The petitioner's original judgment of conviction was in 1976, and was affirmed by the Supreme Court in June, 1982. His original habeas corpus petition was filed in October, 1982. In November, 1982, the state requested that the petition be revised to be made more specific. The petitioner did not respond to this request until the state moved for a nonsuit in February, 1983, which the court granted unless the petitioner complied with the request by May 15, 1983. On May 13, 1983, the petitioner filed his revised petition, on the basis of which this case was tried in July, 1984. During all this time, while the petitioner was free on bond, he filed numerous documents, both through counsel and pro se, in the trial court and in the Supreme Court, making various allegations. One of those, filed in 1979, asserted that Doyle had promised Ashcroft that he would help Ashcroft become a police officer in Canada if Ashcroft would testify against the petitioner. Thus, long before this case was tried, the petitioner was no stranger to the claim of undisclosed promises to Ashcroft.

We, therefore, decline to consider this claim of the petitioner. It was neither pleaded nor litigated, there is no factual finding to support it, we cannot supply such a finding, and the petitioner had ample time and opportunity to raise it properly, which he failed to do.

## II

### WALTER HAZUKA

Hazuka testified in the original trial that he committed the first burglary with Ashcroft, and that after the burglary they took the stolen goods to Cestaro's gas station where Hazuka was employed. He also testified that he had, on an unspecified occasion, seen the petitioner at the gas station and that the petitioner was not doing business there. Applying the principles articulated by *United States* v. *Bagley,* supra, we conclude that the failure to disclose Hazuka's unrelated charges was not material.

First, the importance to the state's case of the testimony of a witness is a significant factor in determining whether suppression of potentially impeaching evidence undermines confidence in the outcome. It cannot be said that Hazuka, unlike Ashcroft, was an "essential link in the state's case . . . ." *State* v. *Grasso,* 172 Conn. 298, 302, 374 A.2d 239 (1977). His entire testimony, both direct and cross examination, was relatively brief, and he mentioned the petitioner but once. There was no dispute at the trial that the guns were stolen and that the petitioner had bought them. The only dispute was whether the petitioner knew that they were stolen, an issue on which Hazuka's testimony shed little, if any, light.

Second, the petitioner established in his cross examination that, despite the facts that Hazuka committed the burglary with Ashcroft and that Ashcroft paid him for his services, he had not been arrested in connec-

tion with the case. The jury knew, therefore, that Hazuka had not even been arrested despite his role as a burglar and thief in the transaction before it. The evidence in question was cumulative. We cannot say that it is reasonably probable that, had the jury known that Hazuka also had other, unrelated and less serious charges pending against him, the outcome would have been different. *United States* v. *Bagley,* supra, 682–84.

There is no error.

In this opinion the other judges concurred.

