******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

VERNON HORN *v.* COMMISSIONER OF CORRECTION
(SC 19364)

Rogers, C. J., and Palmer, Zarella, McDonald, Espinosa and Robinson, Js.

*Argued February 22—officially released June 28, 2016*

*Timothy J. Sugrue,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, *Eugene R. Calistro, Jr.,* senior assistant state's attorney, and *Erika L. Brookman,* assistant state's attorney, for the appellant (respondent).

*Richard A. Reeve,* with whom was *Allison M. Near,* for the appellee (petitioner).

*Opinion*

ESPINOSA, J. The issue that we must resolve in this appeal is whether the habeas court properly granted the petition for a writ of habeas corpus filed by the petitioner, Vernon Horn. After a joint jury trial with his codefendant, Marquis Jackson, the petitioner was convicted of ten offenses[1] in connection with a robbery and murder he committed in 1999 in New Haven. Following the petitioner's direct appeal, the Appellate Court affirmed the judgment of conviction. *State* v. *Jackson*, 73 Conn. App. 338, 341, 808 A.2d 388, cert. denied, 262 Conn. 929, 930, 814 A.2d 381 (2002). Thereafter, the petitioner filed a petition for a writ of habeas corpus in which he claimed, among other things, that he was deprived of his sixth amendment right to effective assistance of counsel during his trial because his counsel had failed to conduct an adequate pretrial investigation and had failed to adequately present a defense at trial.[2] After a trial, the habeas court agreed with the petitioner's claim, granted his petition for a writ of habeas corpus and ordered that the petitioner's conviction be set aside. The respondent, the Commissioner of Correction, then filed this appeal from the judgment of the habeas court.[3] We conclude that the habeas court improperly granted the petitioner's petition for a writ of habeas corpus. Accordingly, we reverse the judgment of the habeas court.

The jury in the underlying criminal trial reasonably could have found the following facts, as set forth by the Appellate Court in its opinion addressing the petitioner's direct appeal from the judgment of conviction. "On January 24, 1999, at approximately 3:30 a.m., Jackson and [the petitioner], along with Steven Brown, entered the Dixwell Deli [deli] on Dixwell Avenue in New Haven, wearing masks and carrying handguns. As [the petitioner] entered the deli, he fired five or six shots from a nine millimeter pistol. One bullet struck Caprice Hardy, a customer, and killed him. A second bullet struck Abby Yousif, an owner of the deli, in the shoulder. Brown and Jackson followed [the petitioner] into the deli.

"Jackson then went behind the counter and attempted to open the cash register. [The petitioner] and Brown went to the deli's back room where they found Vernon Butler, an off-duty employee, and Warren Henderson, a homeless man who helped out around the store. Butler was hit on his head with the butt of a gun, searched for money and taken to the front of the store by [the petitioner] to open the cash register. When Butler could not open the register, Jackson took the cash that Yousif had in his pockets. Butler's [cell phone] was also stolen. The [cell phone] was subsequently used the day after the robbery by Marcus Pearson, who had obtained it from [the petitioner].

"During the course of the robbery, two customers, one of whom was Kend[e]ll Thompson, entered the deli. Upon entering, each individual was forced to the ground at gunpoint and ordered to turn over whatever money they possessed.

"In the back room, Brown [rifled] through Henderson's pockets, looking for any money that he may have had. Finding no money on Henderson's person, Brown searched the cigar boxes in the back room to see if there was any cash hidden there. After searching the back room, Brown returned to the front of the deli, where [the petitioner] was shouting orders by the door and Jackson was still behind the counter near the cash register. Upon hearing the sound of sirens, Jackson, [the petitioner] and Brown fled the scene.

"The police processed the crime scene and found latent fingerprints on a cigar box in the back room. The prints matched Brown's fingerprints on file with the Bridgeport [P]olice [D]epartment. When interviewed by the New Haven police, Brown admitted his participation in the January 24, 1999 robbery and identified Jackson and [the petitioner] as the other individuals involved. Jackson and [the petitioner] were arrested and tried jointly. Jackson was found guilty of eight of the ten counts on which he was charged and sentenced to a total effective sentence of forty-five years imprisonment. [The petitioner] was found guilty of all ten counts on which he was charged and sentenced to a total effective sentence of seventy years imprisonment." (Footnotes omitted.) *State* v. *Jackson*, supra, 73 Conn. App. 342–43. The petitioner appealed from the judgment of conviction, and the Appellate Court affirmed the judgment. Id., 341.

Thereafter, the petitioner filed a petition for a writ of habeas corpus, in which he claimed, among other things, that his trial counsel, Leo Ahern, had failed to provide effective assistance at trial. Specifically, he raised the following two claims that are relevant to this appeal. First, he claimed that Ahern did not adequately investigate the state's theory that the petitioner was in possession of the cell phone that had been stolen during the course of the robbery and, if Ahern had investigated, he would have discovered witnesses who would have contradicted the state's theory. Second, he claimed that Ahern did not adequately investigate Brown's testimony that the petitioner had been with him before, during and after the robbery and murder and that, if Ahern had investigated, he would have discovered evidence that contradicted that testimony. In addition to these ineffective assistance of counsel claims, the petitioner claimed that he was deprived of his constitutional due process right to a fair trial because key state's witnesses perjured themselves during trial and that he was actually innocent. The habeas court conducted a trial on the petition for a writ of habeas corpus over the course

of eight days.

After trial, the habeas court concluded that Ahern had failed to provide effective counsel to the petitioner when he failed to discover the evidence that undermined Brown's testimony that the petitioner had been with him before, during and after the robbery and murder, but it concluded that that failure was not prejudicial because the new evidence did not provide a complete alibi to the petitioner. In addition, the habeas court rejected the petitioner's constitutional and actual innocence claims. The habeas court also concluded, however, that, contrary to the state's theory at trial, the testimony of the new witnesses at the habeas trial regarding the stolen cell phone established that the cell phone could not have been in the petitioner's possession the day after the murder.[4] The habeas court further concluded that Ahern's failure to obtain this information before the criminal trial was deficient performance and that the deficient performance had prejudiced the petitioner's defense. Accordingly, the court granted the petitioner's petition for a writ of habeas corpus and ordered that his conviction be set aside.

On appeal, the respondent concedes that Ahern provided ineffective assistance of counsel by failing to adequately investigate who was in possession of the stolen cell phone in the days following the robbery and murder, but contends that the habeas court incorrectly determined that Ahern's deficient performance was prejudicial to the petitioner. The petitioner disputes this claim and claims as alternative grounds for affirmance that the habeas court improperly determined that: (1) he was not prejudiced by Ahern's failure to investigate and discover the evidence that undermined Brown's testimony concerning the petitioner's whereabouts before, during and after the robbery and murder; (2) the state's use of perjured testimony did not deprive the petitioner of his constitutional due process right to a fair trial; and (3) the petitioner had failed to establish his claim of actual innocence. We agree with the respondent's claim and reject the petitioner's alternative grounds for affirmance.

Before addressing the parties' specific claims, we set forth the standard of review governing ineffective assistance of counsel claims. "The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review. . . .

"A criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings [pursuant to *Strickland* v. *Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]. . . . This right arises under

the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. . . . As enunciated in *Strickland* v. *Washington*, supra, 687, this court has stated: It is axiomatic that the right to counsel is the right to the effective assistance of counsel. . . . A claim of ineffective assistance of counsel consists of two components: a performance prong and a prejudice prong. To satisfy the performance prong . . . the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law." (Citations omitted; internal quotation marks omitted.) *Bryant* v. *Commissioner of Correction*, 290 Conn. 502, 509–10, 964 A.2d 1186, cert. denied sub nom. *Murphy* v. *Bryant*, 558 U.S. 938, 130 S. Ct. 259, 175 L. Ed. 2d 242 (2009).

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. . . . To satisfy the second prong of *Strickland*, that his counsel's deficient performance prejudiced his defense, the petitioner must establish that, as a result of his trial counsel's deficient performance, there remains a probability sufficient to undermine confidence in the verdict that resulted in his appeal. . . . The second prong is thus satisfied if the petitioner can demonstrate that there is a reasonable probability that, but for that ineffectiveness, the outcome would have been different." (Citations omitted; internal quotation marks omitted.) Id., 522. "In making this determination, a court hearing an ineffectiveness claim [based on counsel's failure to investigate] must consider the totality of the evidence before the judge or the jury. . . . Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland* v. *Washington*, supra, 466 U.S. 695–96.

I

We first address the respondent's claim that the habeas court incorrectly determined that Ahern's failure to adequately investigate who was in possession of the stolen cell phone was prejudicial under *Strickland*. We agree.

The following additional facts and procedural history are relevant to this claim.[5] As we have indicated, Butler's cell phone was stolen during the robbery. At the petitioner's criminal trial, the state presented records from Omnipoint Communications regarding calls made from the cell phone after it was stolen. Those records showed that the following five calls had been made from the

cell phone: (1) a call to a Bridgeport number on January 24, 1999, at 4:14 a.m. (first call); (2) a call to a Bridgeport number on January 24, 1999, at 10:48 p.m. (second call); (3) a call to a Bridgeport number on January 25, 1999, at 10:40 a.m. (third call); (4) a call to a New Haven number on January 25, 1999, at 11:07 a.m. (fourth call); and (5) a call to a Bridgeport number on January 25, 1999, at 2:32 p.m. (fifth call). Brown testified at the criminal trial that he had made the first call to Willie Sadler while he, Jackson and the petitioner were driving back to Bridgeport after the robbery, that he made the second call to a female acquaintance and that he made the third call to a drug dealing associate. Brown further testified that, after making the third call, he gave the cell phone to the petitioner, and he never saw it again. Brown and the petitioner were on Stratford Avenue in Bridgeport at the time. Brown denied that he or Sadler made the fourth call. Brown also denied that he made the fifth call.

Pearson, who was an acquaintance of the petitioner's and who was at the deli shortly before the robbery, testified at the criminal trial that, at approximately 11 a.m. on the morning of January 25, 1999, Shalonda Jenkins, whom Pearson knew only as "Yogi," and the petitioner came to his house in New Haven. During their visit, Pearson borrowed a cell phone from the petitioner and used it to make the fourth call to Crystal Sykes.[6] Pearson's testimony on this point, however, was somewhat equivocal. He did not recall making the fourth call to Sykes when the police first questioned him. At some point, however, Pearson apparently came to believe that the police had cell phone records that showed that the fourth call had been made from his house.[7] It was not until the police told Pearson that Sykes had told them that he called her and showed Pearson the cell phone records indicating that the fourth call had been made to the residence where Sykes worked that Pearson remembered making the call. Pearson also testified that he believed that the police suspected him of being involved in the robbery and murder.

At the habeas trial, the petitioner called Pearson, Sykes, Sadler, William Newkirk, who was Sykes' boyfriend at the time of the robbery and murder, and Leroy Dease, a detective with the New Haven Police Department, as witnesses on this issue. Sykes testified that, in January, 1999, she was working at a residence at 59 Ivy Street in West Haven taking care of an incapacitated couple.[8] Counsel for the petitioner questioned Sykes about a statement that she had made to the New Haven Police Department on February 2, 1999. Sykes agreed that she had stated that she did not recall receiving a telephone call from Pearson while working at the 59 Ivy Street address, but she also stated that there was a "good possibility" that Pearson may have called her at "around eleven o'clock" on January 25, 1999. She initially thought, however, that the call had been made

at 11 p.m. Sykes also testified at the habeas trial that she did not know who made the fourth call or if she received the call, and that was what she had tried to tell the police during the investigation. On cross-examination, Sykes testified that Pearson had called her several times at the 59 Ivy Street address. She further testified that she had "always admitted that [she] had gotten the call." It was possible, however, that the call might have been from someone looking for Newkirk. Ultimately, the habeas court interrupted the examination of Sykes, stating that "[y]ou are not going to get any clarity on this particular . . . issue . . . ."

Newkirk testified at the habeas trial that the police told him that Sadler had called him from a cell phone that had been stolen during a robbery and murder.[9] Newkirk contacted Sadler and encouraged him to tell the police who had made the calls from the cell phone. On March 3, 1999, Newkirk called Dease and told him that Sadler was ready to talk about the calls from the cell phone. The next day, Newkirk and Sadler met with Dease at Sadler's residence in Bridgeport. Newkirk testified that he told Sadler to tell Dease "who got that phone from where he called my cell phone from."[10] According to Newkirk, Sadler told Dease that Brown had allowed Sadler to use the cell phone. Newkirk also testified that Sadler had occasionally called him on the telephone at the 59 Ivy Street address in West Haven, because Newkirk's cell phone did not work in that location. On cross-examination, Newkirk testified that he never told Dease that Sadler had made the fourth call to him. Newkirk also testified that he had received a telephone call from Sadler at the 59 Ivy Street address when Sadler was "trying to find [him]." He did not testify as to the date and time of that call.

Dease testified that, on March 4, 1999, when he went to Sadler's residence in Bridgeport to meet with Sadler and Newkirk, Sadler told Dease at that point that Brown had made the first and fifth calls to Sadler. Dease did not recall asking Newkirk at any time if Sadler made the fourth call to him, and Dease agreed with the statement that Newkirk "was not on his radar screen" as being the recipient of any of the cell phone calls.

Pearson testified at the habeas trial that, contrary to his testimony at the criminal trial, he did not see a cell phone in the petitioner's possession on the morning of January 25, 1999, that he did not borrow a cell phone from the petitioner and that he did not call Sykes. Pearson testified that he lied at the criminal trial because the police told him that, if he had not borrowed the cell phone from the petitioner, he must have stolen it during the robbery. Pearson was afraid that, if he refused to testify that he had borrowed the cell phone from the petitioner, he would go to jail and lose custody of his children for a crime that he did not commit. On cross-examination, Pearson testified that, during the

week of January 23 through February 2, 1999, Sykes had called him "almost every day if not every other day" to arrange for marijuana purchases.

Sadler testified at the habeas trial that Brown had made the first and fifth calls to him. Sadler also testified that he knew Newkirk and that he had been to the 59 Ivy Street residence with Newkirk. During his examination of Sadler, counsel for the petitioner requested that Sadler's statement to the New Haven Police Department, given on March 5, 1999, the day after Sadler met with Newkirk and Dease in Bridgeport, be admitted as a prior inconsistent statement. In that statement, Sadler denied having made the fourth call.

In addition to the testimony of these five witnesses, the petitioner presented in written form testimony that Jenkins had given at Jackson's habeas trial. Jenkins was unavailable to testify at the petitioner's habeas trial because she had died in the interim. Jenkins had testified at Jackson's habeas trial that, on the morning of January 25, 1999, she walked to her grandmother's house on Shelton Avenue in New Haven. The petitioner, who was Jenkins' cousin, was in their grandmother's house and asked Jenkins to take a walk with him. After approximately twenty minutes, Jenkins and the petitioner started walking to Pearson's house at 12 Elizabeth Street in New Haven. Jenkins testified that the time was "between 9 and 10 [a.m.]. Around about that time. Because it was in the morning." The walk took approximately fifteen minutes. They rang the doorbell at Pearson's house, and Pearson's mother answered the door. When Pearson came to the door, he did not leave the house, but stood in the doorway. Jenkins did not see the petitioner give a cell phone to Pearson and did not see a cell phone in the petitioner's possession. After leaving Pearson's house, Jenkins and the petitioner returned to their grandmother's house. Although the petitioner was her cousin, Jenkins testified that she never gave this information to the police or to the petitioner's attorney at the time of the criminal trial.[11] Jenkins testified that she was not aware at the time of the petitioner's criminal trial that he had been arrested and charged with the robbery and murder.

The habeas court concluded that this evidence "leads to only one conclusion as to the whereabouts of the cell phone over the two days. The cell phone was taken by Brown to Bridgeport on January 24, 1999, where it remained. The cell phone never came back to New Haven. . . . Therefore . . . Pearson never got the cell phone from the petitioner and never used it to call . . . Sykes as he testified at the criminal trial. Rather . . . Sadler got the phone from Brown and called . . . Newkirk at the residence of . . . Sykes. This evidence was elicited from Newkirk at the habeas trial." In support of this conclusion, the habeas court appears to have relied heavily on the timing of the calls. Specifi-

cally, the habeas court found it "implausible" that Brown could have used the cell phone in Bridgeport at 10:40 a.m. on January 25, 1999, then given the cell phone to the petitioner, who, twenty-six minutes later, loaned it to Pearson at his residence in New Haven so that he could call Sykes, and then returned to Bridgeport where he gave the cell phone to Brown so that Brown could make the fifth call to Sadler at 2:32 p.m. As we have indicated, the habeas court concluded that the failure to present the new evidence at the criminal trial constituted ineffective assistance of counsel and undermined the court's confidence in the jury verdict.

We conclude that, contrary to the habeas court's determinations, the new evidence relating to the use of the cell phone in the days after it was stolen neither conclusively established that Pearson, after borrowing the cell phone from the petitioner, could not have made the fourth call nor gave rise to a reasonable probability that the verdict would have been different if that evidence had been presented at the criminal trial.[12] As the habeas court itself recognized, Sykes' testimony on the issue of whether she had received the fourth call from Pearson was hopelessly unclear. With respect to Newkirk's testimony, although the habeas court stated that evidence that Sadler received the cell phone from Brown and made the fourth call to Newkirk "was elicited from Newkirk," Newkirk testified that *the police had told him* that Sadler had used the cell phone to call him. Newkirk also gave hearsay testimony that Sadler had stated at the March 4, 1999 meeting with Dease that he had used the cell phone to call the telephone at the 59 Ivy Street address, but Sadler denied having made the fourth call in his statement to the police on March 5, 1999. Moreover, Dease testified that he did not recall asking Newkirk whether Sadler had made the fourth call to him and that Newkirk "was not on [his] radar screen" as being a possible recipient of the call during the meeting with Newkirk and Sadler. Thus, even if Newkirk believed that he was testifying truthfully, the most reasonable explanation for this conflicting evidence is that Newkirk was simply confused about the evidence regarding the stolen cell phone and what had transpired at the March 4, 1999 meeting.[13] Moreover, although Newkirk testified that Sadler had occasionally called him at Sykes' place of work, he did not testify as to the dates or times of those calls.

With respect to Sadler's testimony that Brown had made the first and fifth calls to him and that he knew Newkirk had been to the 59 Ivy Street address, this testimony, although consistent with the petitioner's theory that the cell phone was continuously in Bridgeport and that Sadler had made the fourth call, certainly does not compel such a conclusion.

As to Jenkins' testimony at Jackson's habeas trial that the petitioner had been with her for approximately

thirty-five minutes before they arrived at Pearson's house on the morning of January 24, 1999, and that she did not see the petitioner give the cell phone to Pearson, the habeas court in the present case had no opportunity to personally assess Jenkins' credibility because the testimony was in written form. We note, however, that this testimony was given more than twelve years after the incident in question and that her memory of certain details was incorrect. Indeed, the transcript of Jenkins' testimony at Jackson's habeas trial reveals that she testified implausibly that she was not even aware that the petitioner had been arrested and charged with the crimes, in direct contradiction to Ahern's testimony at the habeas trial, confirmed by the criminal trial transcript, that Jenkins had been present at the petitioner's criminal trial. See footnote 11 of this opinion. Accordingly, we conclude that the jury would not have been compelled to believe this testimony. Indeed, neither the habeas court nor the petitioner relies on Jenkins' testimony that the petitioner was with her for thirty-five minutes before they arrived at Pearson's house. Rather, they rely solely on Jenkins' testimony that she did not see the petitioner give the stolen cell phone to Pearson. With respect to that testimony, even if credited, it would not compel the conclusion that the event did not happen.

Finally, as to Pearson's recantation of his testimony at the criminal trial, we previously have recognized that "courts universally view recantation evidence with a healthy dose of skepticism." *Gould* v. *Commissioner of Correction*, 301 Conn. 544, 568, 22 A.3d 1196 (2011). The sole basis for the habeas court's determination that Pearson's testimony at the petitioner's criminal trial was false was "the evidence presented by the other witnesses" at the habeas trial. As we have explained, however, although the testimony of the other witnesses may have been consistent with the petitioner's theory that Brown had continuous possession of the stolen cell phone over the course of the five calls, the testimony was far from conclusive on the issue.

We conclude, therefore, that, far from compelling the conclusion that, contrary to Brown's and Pearson's testimony at the criminal trial, the stolen cell phone was continuously in Bridgeport in the days following the robbery and murder and Pearson could not have made the fourth call, the new evidence was extremely weak and confusing. Indeed, even if entirely credited, the testimony of Sykes, Newkirk, Sadler and Dease at the habeas trial merely left open the *possibility* that Sadler had made the fourth call.[14] Although Jenkins' testimony that the petitioner was with her for thirty-five minutes before they arrived at Pearson's house, if credited, would be very difficult to reconcile with the state's theory that Brown gave the cell phone to the petitioner in Bridgeport shortly after 10:40 a.m. on January 25, 1999, we have concluded that the jury reasonably

could have refused to credit that testimony.

Moreover, the jury at the criminal trial was aware that, if Brown's and Pearson's testimony was true, the following events had to have occurred within a twenty-six minute window on the morning of January 25, 1999:[15] Brown gave the cell phone to the petitioner at Stratford Avenue in Bridgeport; the petitioner went to his car; the petitioner drove to Jenkins' location and found her;[16] Jenkins got in the petitioner's car; the petitioner drove from Jenkins' location to Pearson's residence in New Haven; Pearson learned that the petitioner was carrying a cell phone; Pearson asked to borrow the cell phone (even though he testified at the criminal trial that he had a telephone in his house); and Pearson called Sykes. In addition, Pearson's testimony at the criminal trial as to whether he had made the fourth call was equivocal, and the jury was aware that he had a motive to lie. Thus, the only impact of the new evidence presented at the habeas trial would have been to cast additional doubt on what was already, as the habeas court itself stated, an "implausible scenario."[17] "[W]here the [new] evidence merely furnishes an additional basis on which to challenge [previously admitted evidence, the credibility of which] has already been shown to be questionable . . . the [new] evidence may properly be viewed as cumulative, and hence not material, and not worthy of a new trial." *United States* v. *Persico*, 645 F.3d 85, 111 (2d Cir. 2011), cert. denied,     U.S.    , 132 S. Ct. 1637, 182 L. Ed. 2d 246 (2012); see also *Orsini* v. *Manson*, 5 Conn. App. 277, 281, 498 A.2d 114 (cumulative evidence is not material in constitutional sense), cert. dismissed, 197 Conn. 815, 499 A.2d 804 (1985). Accordingly, we conclude that, if the jury at the criminal trial concluded that the petitioner had possession of the stolen cell phone, there is no reasonable possibility that the new evidence would have affected that conclusion.

We further note that the evidence that the petitioner had possession of the stolen cell phone was not the only evidence presented at the criminal trial that connected him to the crimes. Accordingly, even if we were to assume that there is a reasonable probability that the new evidence could have persuaded the jury at the criminal trial that the petitioner was not in possession of the cell phone, there still would have been sufficient evidence to convict him. Specifically, Brown testified that he, Jackson and the petitioner robbed the deli in the manner previously set forth in this opinion.[18] Shaquan Pallet testified that he had arrived at the deli in a taxi with the murder victim, Hardy. As he and Hardy were entering the deli, he saw the petitioner and Jackson, both of whom he knew, standing outside and smoking a substance that smelled like embalming fluid. A third person was visible but unidentifiable. Inside the deli, Hardy purchased some cigarettes, gave several to Pallet and then Hardy indicated that he intended to remain at the deli. As Pallet left the deli, he saw the petitioner

and Jackson just outside with "skellies" on their heads. Fearing that he was going to be robbed, Pallet walked to the taxi and was driven away.[19]

Thompson testified that he was in the deli when he was confronted by a black male wearing a ski mask who pointed a gun at his head, ordered him to the floor and took $1 from him. When the person went to the back of the deli, Thompson ran out of the deli to his car and "took off." Thompson was able to select a photograph of the petitioner as the person who had held a gun to his head. Thompson selected the photograph because the person's yellowish eyes and his mouth resembled those of the person who had robbed him, but he told the police that he was not 100 percent sure of the identification.[20]

Regina Wolfinger testified that she was sitting in a car outside the deli when she saw a black male run out of the deli and get into a car, which took off quickly. Thereafter, two black males, possibly wearing black hats, came out of the store, stood near an ice machine, and then "took off . . . ." Wolfinger subsequently selected a photograph of the petitioner as resembling one of those men. She testified that her level of certainty was about 75 percent. The petitioner makes no claim that any of these eyewitnesses had a motive to falsely identify him as having been involved in the robbery and murder.

Saliem Al-Dubai, who worked at the deli, testified at the criminal trial that the petitioner, whom Al-Dubai knew as a regular customer, was in the deli at approximately 2:45 to 2:55 a.m. on January 24, 1999, and bought a soda and two loose cigarettes. Pearson came into the deli at approximately the same time and ordered some food. At approximately 3:05 to 3:10 a.m., Al-Dubai and Pearson left the deli and got into a vehicle driven by a person identified only as Naji. At that time, Al-Dubai saw the petitioner cross the street and engage in a whispered conversation with Pearson through the open rear door of the vehicle.

Pearson testified at the criminal trial that he arrived at the deli between 2:30 and 2:45 a.m. on January 24, 1999. He ordered two cheeseburgers and, after receiving the food, left the deli with Al-Dubai and Naji. As he entered Naji's vehicle, the petitioner came over and spoke to him. At approximately 3:15 a.m., Naji dropped Pearson off near his residence, which was approximately three blocks from the deli. As Pearson was eating the cheeseburgers, Zanetta Berryman, with whom Pearson was involved, called him. The call was interrupted and, when Berryman called Pearson back, she told him that the petitioner was with her and he had hung up the phone. Berryman asked Pearson to meet her at the deli. It was then approximately 3:30 a.m. When Pearson arrived at the deli approximately twenty minutes later, the corner was blocked off and he saw ambulances

and police vehicles. He also saw Berryman and the petitioner. A policeman told Pearson that there were two dead bodies inside the deli. Eventually, Pearson talked to the petitioner and Berryman for five to ten minutes and then he and Berryman returned to his house.

None of the new evidence relating to the use of the cell phone directly casts doubt on the testimony of any of these witnesses placing the petitioner at the deli before, during and after the robbery. We therefore conclude that, contrary to the determination of the habeas court, the new evidence regarding the location and use of the stolen cell phone in the days following the robbery and murder does not undermine confidence in the petitioner's guilty verdict and, therefore, Ahern's failure to investigate the issue before trial was not prejudicial under *Strickland*. See *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 522 ("[t]o satisfy the second prong of *Strickland*, that his counsel's deficient performance prejudiced his defense, the petitioner must establish that, as a result of his trial counsel's deficient performance, there remains a probability sufficient to undermine confidence in the verdict that resulted in his appeal" [internal quotation marks omitted]).

## II

We next address the petitioner's claim that the judgment of the habeas court may be affirmed on the alternative ground that Ahern's failure to investigate and discover the evidence that undermined Brown's testimony concerning the petitioner's whereabouts before, during and after the robbery and murder was prejudicial under the second prong of *Strickland*. We disagree.

The following additional facts and procedural history are relevant to this claim. Brown testified at the criminal trial that he met the petitioner and Jackson in Bridgeport on the night of the robbery and murder.[21] Brown could not remember the specific time that they met, but "it was late in the night." After they met, they smoked some marijuana and then drove to New Haven.

After arriving in New Haven, the three men drove around "for a minute" and then Jackson, who was driving, stopped to talk to a woman. She did not get into their car. Brown, Jackson and the petitioner then drove to the deli and parked around the corner from the deli in the middle of the block. They got out of the car and Jackson and the petitioner smoked something that looked like a cigar and smelled like a Magic Marker. Brown saw a taxi pull up in front of the deli. Two people got out of the taxi and entered the deli, and one of them then came out. During the period that they were outside the deli, Brown never saw the petitioner speak to a person sitting in a vehicle.

Brown testified that, at that point, Jackson and the petitioner indicated that they were going to rob the deli.

One of them handed a scarf to Brown, who tied it around his face. Jackson and the petitioner then covered their faces with their "skellies," which Brown testified were ski masks. See footnote 19 of this opinion. Either the petitioner or Jackson handed a gun to Brown, but he could not remember who. Jackson and the petitioner also had guns. After the three men entered the deli, the petitioner fired a rapid series of gunshots. A person who was standing at the counter of the deli was hit by the gunfire and ran to the back of the deli. The person behind the counter ducked down. After the firing stopped, Jackson jumped over the counter and attempted to open the cash register. Brown and the petitioner went to the back of the deli, where Brown had seen someone run into a room and shut the door. The petitioner opened the door and saw a male lying on the floor and another male sitting in a chair. Brown checked the pockets of the person on the floor and then searched some cigar boxes for money. Meanwhile, the petitioner grabbed the person in the chair and brought him to the front of the deli. When Brown left the back room, he saw the petitioner in front of the counter and Jackson behind the counter.

The three men then heard a siren and exited the deli. Brown and Jackson got back into their car and the petitioner left the area, saying that he would return. Brown and Jackson waited in their car for approximately fifteen minutes, at which time the petitioner returned to the car and they left. Brown saw no police and heard no sirens during that time. As they were driving back to Bridgeport, Brown saw the stolen cell phone on an armrest in the car and used it to call Sadler. Jackson and the petitioner dropped Brown off on Warden Avenue in Bridgeport. Brown still had possession of the cell phone at that time. Brown next saw the petitioner on January 25, 1999, on Stratford Avenue in Bridgeport, sometime after he made the third call to a drug dealing associate at 10:40 a.m. He gave the stolen cell phone to the petitioner at that time.

Brown admitted at the criminal trial that he had lied to the police during their investigation of the robbery and murder. He further testified that he had pleaded guilty to conspiracy to commit manslaughter as the result of his involvement in the robbery and murder.[22] He had not yet been sentenced, but the state had agreed to a maximum sentence of twenty-five years imprisonment, suspended after eighteen years, and Brown had the right to argue for a lesser sentence.

Adrienne Debarros, an acquaintance of the petitioner, testified at the criminal trial that she was at the Alley Cat Club (club) in New Haven from approximately 10 or 11 p.m. on January 23, 1999, until it closed at approximately 1:45 to 2 a.m. on January 24, 1999. Debarros saw the petitioner and Jackson outside the club after it closed. Latiesha Smith was also at the club from

approximately 10 or 11 p.m. on January 23 to approximately 1:45 to 2 a.m. on January 24. She testified that she saw Jackson in the club shortly after she arrived and conversed with him at closing time, when she told him to meet her at her house. She arrived home at approximately 2:30 a.m., and Jackson arrived shortly thereafter. He spent the rest of the night with her and left late the next morning.

Berryman testified at the criminal trial that she was at a party on South Genesee Street in New Haven from approximately 11 p.m. on January 23 to 2 a.m. January 24, 1999. At some point after 2 a.m., she was outside smoking a cigarette when Jackson and the petitioner drove by. They stopped, and Berryman asked them for a ride to Pearson's house. Berryman asked the petitioner whether the car was stolen or a "base head rental . . . ." She testified that she asked the question "[b]ecause of the type of person that he is." Berryman saw no guns or masks and no one except Jackson and petitioner in the car. The three of them drove to the deli, where the petitioner gave change to Jackson so that he could make a call from a pay telephone. The petitioner went into the deli and came out about five minutes later with some items that he had purchased. Jackson returned to the car and the petitioner drove the three of them to John Crenshaw's house. Berryman testified that it would take "[a]bout a minute" to run from Crenshaw's house to the deli.

Berryman asked if she could use the bathroom and she and the petitioner exited the car. They entered the house, where Berryman saw several people playing cards. Berryman entered the bathroom, where she remained for approximately fifteen minutes.[23] When she came out, she called several times for the petitioner, who did not respond. Someone went to the front door and called for the petitioner, who eventually came into the house and rejoined Berryman. Berryman then asked if she could use a telephone to call Pearson, who had paged her. The petitioner obtained a cordless telephone and gave it to Berryman, who called Pearson. At that point, the petitioner hung up the telephone. Berryman called Pearson again and asked him to meet her at the deli. While Berryman was on the telephone with Pearson, the petitioner told her that he had seen Pearson at the deli earlier. When Berryman asked him why he had not relayed that information, he ignored her.[24]

Berryman and the petitioner then left Crenshaw's house to return to the deli. At that point, the car that Jackson had been driving was gone. As they were about to enter the deli, a policeman came to the door and told Berryman and the petitioner that they could not come in because there were two dead bodies inside.[25] The police officer was the only official at the scene. He asked Berryman and the petitioner to stay there and asked for their names and addresses. The petitioner

was initially reluctant to identify himself because he was on parole. Berryman told him not to be stupid, and the petitioner told her that she was "an alibi anyway." Berryman ultimately convinced the petitioner to give his name to the police.

Berryman knew Yousif and she was very upset when told that he was dead. The petitioner, however, seemed indifferent, responding with such statements as, "F— him, he ain't nobody." While they waited in front of the deli, "many" police officers arrived, the area was taped off, and Yousif and Hardy were removed by ambulance. Pearson showed up across the street, but Berryman could not go to meet him because she was inside the area cordoned off with crime tape and the police were not letting people cross the tape. Eventually, she was allowed to leave and she went with Pearson to his house.

Crenshaw testified at the criminal trial that he owned a house at 235 West Ivy Street in New Haven and that Jackson rented a room in the house. Crenshaw saw the petitioner at the house at some point on the night of January 23, 1999, or early morning of January 24, but he could not recall the specific time. The petitioner asked Crenshaw for a cigarette and to use the telephone, and Crenshaw agreed.

Officer Mark Francia of the New Haven Police Department testified that he arrived at the deli approximately one to one and one-half minutes after the 3:32 a.m. 911 call. After ascertaining that two persons had been shot, he called the dispatcher to request two ambulances and two emergency units. Numerous police officers arrived at the deli shortly thereafter.

Officer Michael Ferraro of the New Haven Police Department testified at the criminal trial that he arrived at the scene of the robbery and murder approximately twenty to twenty-five minutes after receiving a radio transmission about the shooting, or at 3:52 a.m. at the earliest. At that point, the victims had already been transported to the hospital. Approximately ten to twenty minutes after arriving at the scene, he spoke to the petitioner and Berryman.

The petitioner presented the following testimony at the habeas trial. Kenneth Ransome testified that he was acquainted with the petitioner and Jackson and that he believed that he had seen them inside the club in the early morning hours of January 24, 1999. The club closed sometime between 1:30 and 1:40 a.m. and the crowd remained outside for thirty to forty-five minutes after closing. Ransome saw Jackson and the petitioner in the crowd during that time, and recalled speaking to Jackson. Ransome then drove to the Athenian Diner (diner) in New Haven, which was approximately a fifteen minute drive from the club. He saw the petitioner and Jackson sitting in a car in the parking lot of the

diner and again had a brief conversation with Jackson. Ransome believed that it was then approximately 2:30 or 2:45 a.m. Shamar Madden, who was acquainted with the petitioner, also testified that he saw the petitioner and Jackson outside the club after it closed sometime between 1:45 and 2 a.m. Madden left the club between 2:20 and 2:30 a.m. and went to the diner, where he saw the petitioner and Jackson.

The petitioner also presented as an exhibit the report of Officer Diane Gonzalez of the New Haven Police Department regarding her involvement in the investigation of the crime scene. Gonzalez reported that she arrived at the deli at 3:39 a.m. on January 24, 1999. She helped cordon off the crime scene with tape and was then directed to make a list of the vehicles in the immediate area and their license plate numbers. The license plate number of the car that the petitioner and Jackson were driving that night was not included in Gonzalez' report, and Gonzalez did not report seeing any African-American males sitting in any of the vehicles in the vicinity of the deli.

The petitioner contended to the habeas court that Ransome's and Madden's testimony established that, contrary to Brown's testimony, the petitioner and Jackson could not have been in Bridgeport with Brown in the hours before the robbery and murder. He further contended that Gonzalez' report established that, contrary to Brown's testimony, the car that Jackson and the petitioner were using that night could not have been parked around the corner from the deli for fifteen minutes after the robbery and murder, with Brown and Jackson sitting in it.

The habeas court concluded that Ahern's failure to investigate and present these witnesses at the criminal trial was not prejudicial. To support this conclusion, the court relied on the Appellate Court's decision in Jackson's appeal from the habeas court's denial of his petition for a writ of habeas corpus, in which the Appellate Court concluded that the failure of Jackson's attorney to present this evidence at the criminal trial was not ineffective assistance of counsel because it did not provide the petitioner with an alibi for the precise time that the robbery and murder occurred. *Jackson* v. *Commissioner of Correction*, 149 Conn. App. 681, 701–702, 89 A.3d 426 (2014), appeal dismissed, 321 Conn. 765,      A.3d     (2016).

The petitioner now claims that the habeas court failed to consider the fact that, even if the new evidence did not establish the petitioner's whereabouts at the precise time of the robbery and murder, it indicated that the petitioner was in New Haven between 2 and 3 a.m. on January 24, 1999, thereby discrediting Brown's testimony that the petitioner and Jackson had driven from Bridgeport to New Haven immediately before they robbed the deli. He further contends that Gonzalez'

report discredited Brown's testimony that, after the robbery, Brown and Jackson sat in a car around the corner from the deli for fifteen minutes waiting for the petitioner to rejoin them.

We conclude that there is no reasonable probability that this new evidence would have resulted in a different verdict because there was testimony presented at the criminal trial that cast doubt on the state's theories. Specifically, even if the state's theory that the petitioner and Jackson would have had time between the time that they were seen by Debarros and Smith at the club at approximately 1:45 to 2:00 a.m. and the time of the robbery and murder at approximately 3:30 a.m., to drive to Bridgeport, meet up with Brown, smoke some marijuana, drive back to New Haven, meet up and converse with the unidentified woman, drive to the deli, smoke some drugs outside the deli and then rob the deli was plausible if considered in isolation, this theory was contradicted by the testimony of several individuals. This testimony included: Berryman's testimony that the petitioner and Jackson were with her continuously from the time that they picked her up at South Genesee Street in New Haven at some point after 2 a.m. until they went to the deli and then to Crenshaw's house between 3 and 3:15 a.m.; Al-Dubai's testimony that the petitioner was inside the deli at approximately 2:45 a.m.; and Pearson's testimony that he spoke to the petitioner outside the deli at approximately 3:15 a.m. In addition, Brown's testimony at the criminal trial, that he and Jackson were sitting in a car around the corner from the deli for approximately fifteen minutes after the robbery and murder, they left the scene when the petitioner rejoined them and that he made the first call at 4:14 a.m. while he was driving with the petitioner and Jackson back to Bridgeport, would have been extremely difficult to reconcile with Berryman's testimony that, after she and the petitioner returned to the deli from Crenshaw's house, numerous police and emergency vehicles converged on the scene, Francia's testimony that he called for two ambulances and two emergency vehicles and that numerous police officers responded to the 911 call, and Ferraro's testimony that he interviewed Berryman and the petitioner at the scene approximately thirty to forty-five minutes after the robbery and murder.

Accordingly, the new alibi evidence presented at the habeas trial was merely cumulative of evidence presented at the criminal trial that cast doubt on the state's theory based on Brown's testimony.[26] We therefore conclude that the habeas court properly determined that Ahern's deficient performance was not prejudicial under the second prong of *Strickland* because the petitioner failed to establish that there is a reasonable probability that, if the jury had heard the new evidence regarding the events preceding and following the robbery and murder, its verdict would have been different. *United States* v. *Persico*, supra, 645 F.3d 111 (evidence

that furnishes additional basis to challenge evidence that is already questionable is not material); *Orsini* v. *Manson*, supra, 5 Conn. App. 281 (cumulative evidence is not material in constitutional sense).

### III

We next address the petitioner's claim that the judgment of the habeas court may be affirmed on the alternative ground that the state's use of perjured testimony at the criminal trial deprived him of his constitutional due process right to a fair trial under both the state and federal constitutions. We disagree.

This court has not yet addressed the question of whether the state's unknowing use of perjured testimony violates due process principles.[27] See *Gould* v. *Commissioner of Correction*, supra, 301 Conn. 570 n.18. Although "[a] majority of the federal circuit courts require a knowing use of perjured testimony by the prosecution to find a violation of due process"; (internal quotation marks omitted) id.; the United States Court of Appeals for the Second Circuit has held that, "when false testimony is provided by a government witness without the prosecution's knowledge, due process is violated . . . if the testimony was material and the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." (Footnote omitted; internal quotation marks omitted.) *Ortega* v. *Duncan*, 333 F.3d 102, 108 (2d Cir. 2003).

In the present case, the petitioner contends that both Pearson and Brown perjured themselves at his criminal trial. He further contends that this court should adopt the *Ortega* standard under both the federal and state constitutions. We need not decide that question, however, because, even if we were to adopt the *Ortega* standard, the petitioner cannot prevail under that standard. First, the petitioner has not established conclusively that Brown and Pearson committed perjury at the criminal trial.[28] Second, we have concluded in parts I and II of this opinion that evidence presented at the criminal trial cast serious doubt on Pearson's and Brown's testimony and, even without that testimony, there was still sufficient evidence to support the guilty verdict. Accordingly, we conclude that the habeas court properly determined that there is no reasonable probability that, but for Pearson's and Brown's testimony at the criminal trial, the petitioner would not have been convicted and, therefore, the petitioner was not deprived of his constitutional due process right to a fair trial.

### IV

Finally, we address the petitioner's claim that the judgment of the habeas court may be affirmed on the alternative ground that he established his claim of actual innocence. We disagree.

To obtain habeas relief on the basis of a freestanding claim of actual innocence, the petitioner must satisfy a two part test. "First, taking into account both the evidence produced in the original criminal trial and the evidence produced in the habeas hearing, the petitioner must persuade the habeas court by clear and convincing evidence, as that standard is properly understood and applied in the context of such a claim, that the petitioner is actually innocent of the crime of which he stands convicted. Second, the petitioner must establish that, after considering all of that evidence and the inference drawn therefrom . . . no reasonable fact finder would find the petitioner guilty." (Internal quotation marks omitted.) *Gould* v. *Commissioner of Correction*, supra, 301 Conn. 557–58.

"Actual innocence is not demonstrated merely by showing that there was insufficient evidence to prove guilty beyond a reasonable doubt." Id., 560–61. "Rather, actual innocence is demonstrated by affirmative proof that the petitioner did not commit the crime." Id., 561. "Affirmative proof of actual innocence is that which might tend to establish that the petitioner *could not* have committed the crime even though it is unknown who committed the crime, that a *third party* committed the crime or that *no* crime actually occurred." (Emphasis in original.) Id., 563.

"Discrediting the evidence on which the conviction rested does not revive the *presumption* of innocence. To disturb a long settled and properly obtained judgment of conviction, and thus put the state to the task of reproving its case many years later, the petitioners must affirmatively demonstrate that they are *in fact* innocent." (Emphasis in original.) Id., 567. Nevertheless, we have recognized that, "[u]nder circumstances where new, irrefutable evidence is produced that so completely eviscerates the prosecution's case such that the state would have no evidence to go forward with upon retrial, perhaps a functional equivalent to actual innocence might credibly be claimed." Id., 568.

In the present case, the petitioner claims that the new evidence presented at the habeas trial shows that Brown's and Pearson's testimony at the criminal trial was false. He further claims that, if the only evidence before the jury had been Berryman's testimony, it would have been "nearly impossible" for the petitioner to commit the robbery and murder within the period that he was not in Berryman's presence while she remained in the bathroom at Crenshaw's house. Specifically, the petitioner claims that he would have had only from 3:22 to 3:32 a.m. to: "(1) leave Berryman at [Crenshaw's house]; (2) run to the [d]eli; (3) meet Jackson and Brown; (4) put on a ski mask from some unknown location; (5) change his clothes, or at least his coat; [6] grab a gun (or guns) from some unknown location; [7] enter the [d]eli and remain inside for [five to seven]

minutes; [8] leave the [d]eli; and [9] run back to [Crenshaw's house] just in time to respond calmly to Berryman's request to borrow a phone."

This claim assumes, however, that the approximate times given by the various witnesses were precise times.[29] Specifically, the petitioner points to Pearson's testimony that he spoke to the petitioner outside the deli at 3:15 a.m., Berryman's testimony that the petitioner then went to Crenshaw's house, Berryman's testimony that she was in the bathroom for fifteen minutes,[30] and Pearson's and Berryman's testimony that the petitioner was with her when she called Pearson at 3:30 a.m. All of these times, however, were approximate. Thus, even if we were to agree that it would have been *impossible* for the petitioner to commit the robbery and murder within a ten minute window, which we do not, the jury reasonably could have concluded that the petitioner had from 3:10 to 3:35 a.m., or possibly even longer, to leave Crenshaw's house, commit the crimes, and then return to Crenshaw's house. Moreover, the petitioner points to nothing in the evidence that would establish that he could not have been carrying a ski mask or a gun during the entire period in question.

Thus, we do not agree that it would have been impossible for the petitioner to run from Crenshaw's house to the deli—which Berryman testified would take approximately one minute—rob the deli and run back to Crenshaw's house within the relevant window of time. Accordingly, even if we were to assume that the petitioner was not required to present affirmative evidence to establish his actual innocence, this is not a case in which the petitioner has "so completely eviscerate[d] the prosecution's case . . . that the state would have no evidence to go forward with upon retrial . . . ." *Gould* v. *Commissioner of Correction*, supra, 301 Conn. 568. Accordingly, we conclude that the habeas court properly concluded that the petitioner did not establish that he was actually innocent.

The judgment of the habeas court is reversed and the case is remanded to that court with direction to deny the petitioner's petition for a writ of habeas corpus.

In this opinion the other justices concurred.

[1] The petitioner was convicted of one count of felony murder in violation of General Statutes § 53a-54c, one count of assault in the first degree in violation of General Statutes § 53a-59, three counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), two counts of attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 and 53a-134 (a) (2), one count of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (2), one count of burglary in the first degree in violation of General Statutes (Rev. to 1999) § 53a-101 (a) (2), and one count of carrying a pistol without a permit in violation of General Statutes (Rev. to 1999) § 29-35 (a). *State* v. *Jackson*, 73 Conn. App. 338, 341, 808 A.2d 388, cert. denied, 262 Conn. 929, 930, 814 A.2d 381 (2002).

[2] For purposes of this appeal, the relevant pleading is the petitioner's fifth amended writ of habeas corpus.

[3] After the habeas court granted the respondent's request for permission to appeal from the judgment of the habeas court, the respondent appealed

to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[4] The habeas court also concluded that Ahern should have sought information from the company that provided telephone services for the stolen cell phone regarding the origination of the calls made from the cell phone after it was stolen. The petitioner does not dispute, however, that he made no such claim in his petition for a writ of habeas corpus and that such information was no longer available when Ahern took on the petitioner as a client. Accordingly, to the extent that the habeas court determined that this constituted deficient performance and prejudiced the petitioner, we conclude that any such determination was improper.

[5] Unfortunately, because the testimony of the various witnesses at the original criminal trial was confusing and contradictory, it is impossible to construct a single narrative from that testimony while doing justice to the petitioner's claim that there is a reasonable possibility that the result of that trial would have been different but for Ahern's defective counsel. Accordingly, we are required to recite the testimony of each individual witness at some length.

[6] Sykes married William Newkirk after the criminal trial and before the habeas trial, and changed her last name to Newkirk. To distinguish her from Newkirk, we refer to her in this opinion as Sykes.

[7] Pearson was apparently confused on this point. As we have indicated, the cell phone records did not reveal the exact locations from which the calls originated. See footnote 4 of this opinion.

[8] There is no explanation in the record as to why the cell phone records indicate that the fourth call was made to a New Haven telephone number, when the telephone number was for the 59 Ivy Street address in West Haven.

[9] When counsel for the petitioner asked Newkirk, "[b]ut that's what dragged you into this case is you got a call from . . . Sadler on that cell phone that the police told you had been taken in the . . . robbery/murder?" Newkirk answered, "Yes." Newkirk had just testified, however, that "the detectives told me" that Sadler had called Newkirk from the cell phone. We are unaware of any other evidence that would support the conclusion that the police believed that the fourth call was from Sadler to Newkirk. We also note that Newkirk never testified at the habeas trial that he had an independent recollection of receiving the fourth call from Sadler.

[10] There was no call from the stolen cell phone to Newkirk's cell phone. Accordingly, Newkirk either misspoke or he misunderstood the nature of the evidence that the police had obtained regarding the cell phone.

[11] Ahern testified at the habeas trial that he had intended to call Jenkins as a witness at the petitioner's criminal trial. Jenkins had attended a portion of the trial, but on the day that Ahern intended to call her, she was not present and Ahern was unable to locate her. This testimony is corroborated by the criminal trial transcript. Ahern did not request a continuance and rested his case without calling Jenkins as a witness. Although Ahern testified at the habeas trial that Jenkins had information about the petitioner's interaction with Pearson on January 25, 1999, he did not indicate what that information was or how he obtained it. Ahern represented to the trial court at the criminal trial, however, that Jenkins would testify that she did not see a cell phone while she was at Pearson's house on the morning of January 25, 1999.

[12] Although we must accord deference to the habeas court's credibility assessments; see *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 268, 112 A.3d 1 (2015) ("we ordinarily accord deference to credibility determinations that are made on the basis of [the] firsthand observation of [a witness'] conduct, demeanor and attitude" [internal quotation marks omitted]); there is no requirement that we defer to the habeas court's legal determination that new evidence is so compelling that a reasonable juror could not fail to credit it. Cf. *Levesque* v. *Bristol Hospital, Inc.*, 286 Conn. 234, 249, 943 A.2d 430 (2008) (issue of fact "becomes a conclusion of law . . . when the mind of a fair and reasonable [person] could reach only one conclusion" [internal quotation marks omitted]). Nor are we required to defer to the trial court's legal determination that there is a reasonable probability that newly discovered evidence would have resulted in a different verdict if credited by the jury, i.e., that it undermines confidence in the verdict. Cf. *Lapointe* v. *Commissioner of Correction*, supra, 297–98 ("the issue of materiality presents a mixed question of law and fact, with the trial court serving as the fact finder").

[13] Specifically, Newkirk testified at the habeas trial that the police had told him before the March 4, 1999 meeting in Bridgeport that Sadler had

called him from the stolen cell phone. With this belief in mind, he may have simply misunderstood when Sadler, who previously had denied knowing who had made the first and fifth calls, admitted to Dease that he had received those *calls* from Brown, and understood Sadler to be admitting that he had received the stolen *cell phone* from Brown. The petitioner points to no evidence other than Newkirk's testimony that would support the conclusion that Sadler told Dease that he received the cell phone from Brown so that he could make the fourth call. Indeed, if there is any such evidence, we can perceive no reason why the petitioner would not have confronted Sadler with that evidence at the habeas trial.

[14] The jury could have believed Newkirk's testimony that Sadler had told Dease that he made the fourth call—or at least believed that Newkirk truly believed that Sadler had made that statement—without being compelled to conclude that Sadler actually made the call. There was significant confusion regarding the calls made from the stolen cell phone. The jury also could have believed that Sadler called Newkirk occasionally at the 59 Ivy Street address without believing that Sadler made the fourth call to Newkirk.

[15] Brown testified at the criminal trial that he made the third call at 10:40 a.m. on January 25, 1999, and that he then gave the cell phone to the petitioner on Stratford Avenue in Bridgeport. Pearson testified that the petitioner loaned the cell phone to Pearson at Pearson's house in New Haven that same morning and that he used the cell phone to make the fourth call, which was at 11:07 a.m. The cell phone records reveal that the third call lasted one minute. Thus, these events would have had to occur between 10:41 a.m. and 11:07 a.m.

The parties have cited no evidence in the record regarding the time required to drive from Bridgeport to New Haven. We take judicial notice that the distance between the cities is approximately twenty miles and the average driving time in good traffic conditions is twenty-five to thirty minutes. See Google Maps (2016), available at https://www.google.com/maps/dir/Bridgeport,+CT/New+Haven,+CT (last visited June 14, 2016).

[16] Pearson testified at the criminal trial that the petitioner and Jenkins arrived at his house together. There is no evidence that Jenkins was with the petitioner in Bridgeport or that the petitioner communicated with Jenkins on the morning of January 25, 1999, about meeting and going to Pearson's house. Thus, it is logical to assume that the petitioner would have had to have gone to Jenkins' location, inform her or be informed of the plan, and then go to Pearson's residence.

[17] The petitioner contends that, "[h]aving utterly failed to develop and present the available evidence to challenge the state's cell phone story . . . Ahern was forced to concede the accuracy of the testimony of Pearson" when Ahern argued to the jury at the criminal trial that Pearson used the stolen cell phone. Ahern did not concede, however, that the petitioner gave the cell phone to Pearson. Rather, Ahern was attempting to imply that Pearson implicated the petitioner because Pearson himself had taken the cell phone from the deli. Although there was little evidence to support that theory, there was also little evidence to support the theory that Sadler used the cell phone to call Newkirk.

[18] The details of Brown's testimony are set forth in part II of this opinion.

[19] When the police interviewed Pallet after the robbery and murder, they showed him an array of eight photographs that included photographs of Jackson and the petitioner and asked him if he saw anyone who had been outside the deli before the robbery. Pallet pushed the photographs of the petitioner and Jackson aside and said "take it for what it is . . . ." Pallet was later arrested on various charges. When Pallet was brought to the police station, Dease again interviewed him and showed him the photographic array. At that point, Pallet again chose the photographs of Jackson and the petitioner and signed them.

The petitioner points out that Pallet testified that the petitioner was wearing a distinctive jacket when Pallet saw him outside the deli, and that none of the victims of the crime described such a jacket. The fact that none of the victims remembered the jacket does not conclusively establish, however, that the petitioner was not wearing it. The petitioner also contends that Pallet's testimony that the petitioner was wearing a "skellie," which the petitioner contends is a stocking-type covering without openings for the eyes and mouth, was inconsistent with other testimony that the perpetrators wore masks with such openings. Pallet never saw the head covering that the petitioner was wearing when it was pulled over his face, however, and Brown testified at the criminal trial that the petitioner was wearing a "skellie," which he described as a ski mask.

[20] The petitioner contends that, on cross-examination, Thompson retracted his testimony identifying the petitioner as the person who had held a gun to his head. We disagree. On direct examination at the criminal trial, Thompson stated that the eyes of the person in the photograph that he selected looked "familiar" and he believed that the photograph was of the person who had held a gun to his head, but he could not be 100 percent sure. On cross-examination, when Ahern asked Thompson whether the reason that he chose the photograph of the petitioner was "because of the eyes," Thompson replied, "Yes." Ahern immediately followed up that question by asking Thompson: "You were not picking out that photograph to tell . . . Dease that this is the man who did it, correct?" Thompson again agreed. Accordingly, it is reasonable to conclude that Thompson merely intended to testify on cross-examination that the petitioner's photograph *looked like* the perpetrator, but Thompson could not be entirely sure that he *was* the perpetrator.

[21] As we have indicated, the robbery and murder took place shortly before 3:32 a.m. on January 24, 1999.

[22] We note that conspiracy to commit manslaughter is not a cognizable offense. *State* v. *Greene*, 274 Conn. 134, 164, 874 A.2d 750 (2005) ("conspiracy to commit manslaughter in the first degree with a firearm is not a cognizable crime because it requires a logical impossibility, namely, that the actor . . . [agree and] intend that an unintended death result" [internal quotation marks omitted]), cert. denied, 548 U.S. 926, 126 S. Ct. 2981, 165 L. Ed. 2d 988 (2006).

[23] Berryman also stated several times that she was not sure exactly how long she remained in the bathroom, but that it was "a while" or "quite a while . . . ."

[24] The evidence presented at the criminal trial reflects that there was some rivalry between Pearson and the petitioner for Berryman's attentions, and that Berryman had been annoyed by and resisted the petitioner's advances. This would explain the petitioner's apparent attempts to prevent Berryman from meeting up with Pearson on the night in question.

[25] As we have indicated, Yousif had been shot, but he was not, in fact, dead.

[26] If the jury had disbelieved Brown's testimony regarding the events that preceded and followed the robbery and murder, it still could have believed the eyewitnesses who identified the petitioner as a participant in the crimes. See part I of this opinion. In addition, while the record admittedly reveals no reason why Brown would have testified truthfully about his, the petitioner's and Jackson's participation in the crimes, while lying about their actions before and after the crimes, the jury was not required to reject all of Brown's testimony simply because it disbelieved a portion of it. *State* v. *Meehan*, 260 Conn. 372, 381, 796 A.2d 1191 (2002) ("[i]t is axiomatic that evidentiary inconsistencies are for the jury to resolve, and it is within the province of the jury to believe all or only part of a witness' testimony").

[27] The petitioner makes no claim that the state knowingly used perjured testimony at his criminal trial.

[28] As we have explained, although the habeas court concluded that Pearson's testimony at the criminal trial was false "based upon the evidence presented by the other witnesses" at the habeas trial, the testimony of those witnesses did not establish conclusively that, contrary to Pearson's testimony, he did not make the fourth call to Sykes. See part I of this opinion. As we have also explained, courts view recantation testimony with great skepticism. *Gould* v. *Commissioner of Correction*, supra, 301 Conn. 568.

[29] We assume for purposes of this portion of the opinion that the jury would have rejected Pearson's and Brown's testimony if the evidence presented at the habeas trial had been presented at the criminal trial because, even if that were the case, the petitioner cannot prevail on his claim that it would have been impossible for him to commit the crimes under Berryman's account of the events on the night in question.

[30] The petitioner does not cite where in the record Berryman stated that she may have been in the bathroom for as little as ten minutes. Our review of the record reveals that she testified that, although she was not certain how long she was in the bathroom, it was approximately fifteen minutes.